949 P.2d 141

**KOHALA AGRICULTURE, Bill Bledsoe, Carachelle, Chapman Irrevocable Trust, Michael Cohlmia, Janelle Catherine Curry Trust, Natalie Barnhart Curry Trust, Terry A. Darden, Robert K. Dowd, Elliot Ginchansky, Helen Rounsaville Hamilton, Wayne Hellman, John J. Hoffman, Jo Hundahl, Russell Johnson, William E. Johnson, Jr., Olin Lancaster, Marion R. Lawler, Jr., Donald McGuire, Larry Pascal, Samuel Roach, Wayland Taylor, Sr., Wayland Taylor, Jr., W.L. Tompson, and Wimmer Investments, Plaintiffs–Appellants,**

v.

**DELOITTE & TOUCHE, Defendant–Appellee,**

and

**DELOITTE & TOUCHE, Third–Party Plaintiff,**

v.

**AGRO-PACIFIC DEVELOPMENT, INC., Pacific Agriculture, Inc., DeDomenico Agro–Pacific Enterprises, John Does 1–20, Doe Corporations 1–10, Doe Partnerships 1–10, and Doe Entities 1–10, Third–Party Defendants.**

No. 18368.

Intermediate Court of Appeals of Hawai'i.

Nov. 10, 1997.

Opinion on Reconsideration Dec. 18, 1997.

Paul Maki and Elise Owens Thorn, Maki & Thorn, on the briefs, Honolulu, for Plaintiffs–Appellants and Third–Party Defendants.

John T. Komeiji, Lyle Y. Harada, and Patsy H. Kirio, Watanabe, Ing & Kawashima, Honolulu, and Eric H. Fisher, Deloitte & Touche, LLP, on the brief, New York City, for Defendant–Appellee.

Before BURNS, C.J., and WATANABE and ACOBA, JJ.

ACOBA, Judge.

We hold that the tort of negligent misrepresentation, as set forth in the *Restatement (Second) of Torts* § 552 (1977) (section 552), applies in actions against an accountant for the negligent obtaining and/or communication of information contained in an audit report. Under section 552, an accountant owes a duty to exercise reasonable care and competence in obtaining and communicating this information.

We further hold that section 552 governs actions brought by parties who are not clients of an accountant. With respect to such third parties, an accountant's liability for the negligent obtaining and/or communicating of information furnished in an audit report extends to persons for whose benefit and guidance the accountant intends to supply the report or to whom the accountant knows the recipient of the report intends to supply it, and the accountant's liability is limited to the loss suffered by such persons through reliance on the report in a transaction the accountant intended the report to influence, or knew that the recipient so intended, or in a substantially similar transaction. Section 552(2).

Defendant–Appellee/Third–Party Plaintiff Deloitte & Touche (D & T), the accounting firm involved in this case, prepared two audit reports which are of primary significance in this appeal. One audit was performed for Plaintiff–Appellant Kohala Agriculture (Kohala) of Kohala's 1983 financial statements (the 1983 Kohala audit) and resulted in an audit report (the 1983 Kohala report). Keaau Agriculture (Keaau) and its investors were not D & T's clients for purposes of the 1983 Kohala audit. However, the complaint filed herein asserted that Keaau and some of Keaau's investors suffered damages in justifiably relying on the 1983 Kohala report.

The first circuit court (the court) ruled, without specifying the extent of an accountant's duty, that D & T owed no duty to Keaau or to its investors. We believe that applying section 552, there were genuine issues of material fact as to whether D & T owed a duty to Keaau in obtaining and communicating information contained in the 1983 Kohala report. We thus vacate that part of that October 8, 1993 summary judgment order which concluded as a matter of law that D & T owed no duty to Keaau in connection with the 1983 Kohala report and the corresponding part of the August 31, 1994 partial final judgment which granted summary judgment in favor of D & T "on all claims relating to Keaau."

D & T also performed an audit and prepared an audit report of the 1984 financial statements of Keaau (the 1984 Keaau audit and report). The record does not establish whether the court determined that a claim based on the 1984 Keaau audit and report was sufficiently alleged in the complaint and/or whether such a claim was included in that October 8, 1993 summary judgment order dismissing "all claims" relating to Keaau. Accordingly, we remand these issues for determination by the court.

As a subsidiary matter, we confirm that an interlocutory appeal under Hawai‘i Revised Statutes (HRS) § 641–1(b) (1993) must be perfected within thirty days of the entry of the order which was appealed. Thus, we dismiss Plaintiffs–Appellants' (Plaintiffs) interlocutory appeal of that October 8, 1993 order granting summary judgment in favor of D & T on Kohala's claims for losses incurred before the 1983 Kohala report was issued, because Plaintiffs did not file their appeal within thirty days of October 8, 1993.

I.

A.

This case concerns ventures in Hawai‘i's macadamia nut industry. Hawaiian Holiday

Macadamia Nut Company, Inc. (Hawaiian Holiday) was solely owned by Paul and Anita DeDomenico (collectively the DeDomenicos). Hawaiian Holiday was involved with three limited partnerships formed to develop macadamia nut orchards. The DeDomenicos had ownership interests in general partners in all of these limited partnerships. Hawaiian Holiday contracted with each limited partnership to provide agricultural land, services, and/or macadamia nut trees to the partnerships.

The first limited partnership, Hawaiian Macadamia Orchard (HMO), was formed in 1982. Its general partner "was related" to Hawaiian Holiday by common ownership, presumably the DeDomenicos since they were the sole owners of Hawaiian Holiday. HMO bought macadamia nut orchards and leased the underlying land from Hawaiian Holiday.

HMO also contracted with Hawaiian Holiday for management of the orchards and the provision of macadamia nut trees.

Kohala, the second limited partnership, was formed on July 15, 1983. Kohala's general partner was Third–Party Defendant De-Domenico Agro–Pacific Enterprises (AP Enterprises). AP Enterprises' general partners were Third–Party Defendant Agro–Pacific Development, Inc. (AP Development) and DeDomenico Orchard Corporation (Orchard). Orchard was solely owned by the DeDomenicos. Kohala had numerous limited partners, including some of the individuals and entities referred to herein as the Kohala investors [1] and the Kohala/Keaau investors.[2]

Kohala contracted with Hawaiian Holiday for agricultural work and for grafted macadamia nut trees. Kohala agreed to sell all of its harvested macadamia nuts to Hawaiian Holiday at fixed prices.

Keaau, the third limited partnership, was formed on October 17, 1984. Keaau's general partners were Third–Party Defendant Pacific Agriculture, Inc. (Pacific) and Orchard. Keaau's limited partners included some of the individuals and entities referred to herein as the Keaau investors [3] and the Kohala/Keaau investors.[4]

1. The Kohala investors, who invested only in Plaintiff–Appellant Kohala Agriculture (Kohala), were Plaintiffs–Appellants Jo Hundahl (Hundahl), Marion R. Lawler, Jr. (Lawler), and Larry Pascal (Pascal).

 Hundahl and Lawler were limited partners of Kohala. Pascal invested in Hawaii Farms Partnership, which was a limited partner of Kohala.

2. The Kohala/Keaau investors, who invested in both Kohala and Keaau Agriculture (Keaau), were Plaintiffs–Appellants Chapman Irrevocable Trust (Chapman), Janelle Catherine Curry Trust (Janelle Trust), Natalie Barnhart Curry Trust (Natalie Trust), Robert K. Dowd (Dowd), Elliot Ginchansky (Ginchansky), Helen Rounsaville Hamilton (Hamilton), Wayne Hellman (Hellman), Russell Johnson (R. Johnson), William E. Johnson, Jr. (W.Johnson), Olin Lancaster (Lancaster), Samuel Roach (Roach), Wayland Taylor, Sr. (Taylor Sr.), Wayland Taylor, Jr. (Taylor Jr.), and W.L. Tompson (Tompson).

 Pearl M. Dunn (whose interest passed under her will to Janelle Trust and Natalie Trust in 1988), Ginchansky, Hamilton, Hellman, R. Johnson, W. Johnson, Roach, Taylor Sr., and Taylor Jr. were limited partners of Kohala. R. Johnson sold his interest in Kohala to his father, W. Johnson, in January 1991 and thus R. Johnson was not a limited partner of Kohala after January 1991. Taylor Jr. also sold his interest in Kohala in 1991 and was no longer a limited partner of Kohala thereafter.

 Chapman invested in Hawaii Nuts Partnership, Dowd invested in Dowd Investments, and Lancaster and Tompson invested in a partnership called Tompson & Lancaster. Hawaii Nuts Partnership, Dowd Investments, and Tompson & Lancaster were all limited partners of Kohala.

3. The Keaau investors, who invested only in Keaau, were Plaintiffs–Appellants Bill Bledsoe (Bledsoe), a partnership called Carachelle, Michael Cohlmia (Cohlmia), Terry A. Darden (Darden), John J. Hoffman (Hoffman), Donald McGuire (McGuire), and Wimmer Investments (Wimmer).

 Carachelle, Hoffman, McGuire, and Wimmer were limited partners of Keaau.

 Bledsoe and Darden invested in a partnership called Bledsoe, Darden, Puckett & Tompson and Cohlmia invested in 6–Nutts Partnership. Bledsoe, Darden, Puckett & Tompson and 6–Nutts Partnership were both limited partners of Keaau.

4. Pearl M. Dunn (whose interest passed under her will to Janelle Trust and Natalie Trust in 1988), Dowd, Ginchansky, Hellman, R. Johnson, W. Johnson, Roach, and Taylor Jr. were limited partners of Keaau. R. Johnson sold his interest in Keaau to his father, W. Johnson, in January 1991 and thereafter R. Johnson was no longer a limited partner in Keaau.

 Chapman invested in Hawaii Nuts II, Hamilton invested in Carachelle, Lancaster invested in Lancaster Family Partnership, Taylor Sr. and Taylor Jr. invested in Aloha Partners and 6–Nutts Partnership, and Tompson invested in a partner-

Keaau contracted with Hawaiian Holiday for the planting of grafted macadamia nut trees supplied by Hawaiian Holiday. Like Kohala, Keaau agreed to sell all of its harvested macadamia nuts to Hawaiian Holiday at fixed prices.

D & T performed accounting services for Hawaiian Holiday and for the three limited partnerships.[5]

D & T reviewed Hawaiian Holiday's financial statements for the years ending March 31, 1982 and March 31, 1983 and issued a report (the 1982–83 Hawaiian Holiday report). In addition, D & T apparently continued to review Hawaiian Holiday's financial statements for 1983–84.

D & T prepared audits for HMO in 1982, 1983, and 1984.

D & T performed the 1983 Kohala audit for Kohala covering the period from the date of Kohala's inception until December 31, 1983. The 1983 Kohala report was dated March 2, 1984 and issued on March 30, 1984.

D & T completed a second audit of Kohala's financial statements for the next period ending December 31, 1984 (the 1984 Kohala audit); this audit report (the 1984 Kohala report), dated February 15, 1985, was issued on May 29, 1985.

D & T conducted the 1984 Keaau audit for the period from the date of Keaau's inception until December 31, 1984.

### B.

On February 20, 1991, Plaintiffs, who include Kohala, the Kohala investors, the Keaau investors, and the Kohala/Keaau investors, filed their complaint against D & T.

The complaint described "a pattern of fraud" committed by Hawaiian Holiday. Paul DeDomenico, the owner of Hawaiian Holiday and "a principal in the creation of [Kohala]," allegedly "failed to reveal material matters regarding himself and Hawaiian Holiday in the private placement memorandum used in the solicitation of investors" for Kohala. After Kohala began operations, Hawaiian Holiday purportedly sent invoices to Kohala for 179,000 grafted macadamia nut trees but delivered only 50,000 trees, "overbilled for costs of clearing and seeding the Kohala land, failed to plant out the acreage [on the Kohala land] at the contractually required density of 96 trees per acre ..., and planted ungrafted trees instead of grafted trees."[6]

The thrust of Plaintiffs' claims against D & T is that D & T was negligent in failing to uncover Hawaiian Holidays' fraud and to report such fraud in its audit reports, thus causing injury to Plaintiffs who had relied on these misleading reports. Specifically, Plaintiffs claimed that D & T was negligent in failing to realize, in preparing the 1983 and 1984 Kohala reports, that Kohala did not possess the grafted macadamia nut trees for which it had already paid Hawaiian Holiday but Hawaiian Holiday had fraudulently failed to deliver. The complaint explicitly stated that "[D & T's 1983 Kohala report] was misleading and inaccurate when it stated that Kohala possessed $936,000 worth of macadamia nut trees, because those trees did not exist [when the 1983 Kohala report was issued]." The 1984 Kohala report also failed to reveal that Kohala did not have the $1,475,283 worth of macadamia nut trees for which it had paid Hawaiian Holiday.

---

ship called Bledsoe, Darden, Puckett & Tompson. Hawaii Nuts II, Carachelle, Lancaster Family Partnership, Aloha Partners, 6–Nutts Partnership, and Bledsoe, Darden, Puckett & Tompson were all limited partners of Keaau.

5. Deloitte, Haskins & Sells, the predecessor of Defendant–Appellee/Third–Party Plaintiff Deloitte & Touche (D & T), actually performed some of these services.

6. The complaint states:

The macadamia nut trees which [Hawaiian Holiday Macadamia Nut Company, Inc. (Ha-

waiian Holiday)] was to sell to Kohala were to have been grafted prior to sale. In the grafting process, macadamia nut shoots of a macadamia variety which bears good nuts are grafted onto macadamia nut seedlings of a macadamia variety which produces a hardy trunk and root system. This grafting is an indispensable step in macadamia nut culture.

Plaintiffs-Appellants (Plaintiffs) alleged that Hawaiian Holiday "concealed its fraud" by "plant[ing] the outermost and most visible rows of the Kohala property with grafted macadamia nut trees, and plant[ing] the interior, less accessible rows with ungrafted macadamia nut trees."

■ Hence, Plaintiffs alleged that "in violation of both its contract of employment[7] and of its duty to Plaintiffs, [D & T] failed to exercise that degree of care, skill and competence exercised by reasonably competent members of its profession in auditing the 1983 [and 1984] Kohala financial statements and failed to exercise reasonable care in verifying the underlying data employed in preparing" the 1983 and 1984 Kohala reports.

While ultimately we are concerned with the question of D & T's duty to Keaau, a review of all of the claims is relevant to our disposition of this appeal.

Kohala claimed injury because in reliance on the 1983 and 1984 Kohala reports it continued to pay Hawaiian Holiday for trees that Kohala never received and for other services Hawaiian Holiday improperly performed.[8] In addition, Kohala contended that it could have pursued corrective action against Hawaiian Holiday prior to 1991 if D & T had discovered Hawaiian Holiday's fraud while conducting the 1983 and 1984 Kohala audits.

The Kohala investors asserted injury from D & T's negligence in two ways. First, they posited that if the 1983 Kohala report had revealed Hawaiian Holiday's fraud against Kohala, then "in all likelihood [the fraudulent solicitation of Kohala investors] would have been discovered" when the responsible parties (including, allegedly, Hawaiian Holiday) were still solvent. Second, certain unnamed Kohala investors allegedly would not have made loans to Kohala in 1985 had Hawaiian Holiday's conduct been revealed by the 1983 and 1984 Kohala audits and reports by D & T.

Kohala, as the successor in interest to Keaau, asserted that Keaau allegedly suffered "injury [caused by Hawaiian Holiday] in a variety of ways."[9] The complaint contended that Keaau would not have contracted with Hawaiian Holiday had Keaau known of the alleged fraud committed by Hawaiian Holiday against Kohala. While Keaau was not a client of D & T at the time of the 1983 Kohala audit and report, Plaintiffs maintained that D & T "knew or ought to have known" that Orchard, a partner in Kohala's general partner and a co-general partner of Keaau, and the principals in Keaau's general partners, who were also principals in Kohala's general partner and limited partners of Kohala, "would receive and rely on copies of [Kohala's 1983[10]] audited financial statement."

The Keaau investors claimed that, in deciding to invest in Keaau, they reasonably relied on the private placement memorandum used to solicit investors and the attorneys who prepared this memorandum "reasonably and foreseeably relied upon" the misleading 1983 Kohala report.

The Kohala/Keaau investors alleged injury caused by "reasonabl[e] and foreseeabl[e]" reliance on the 1983 Kohala report in making their decision to invest in Keaau.

---

7. Although they allege that D & T violated its employment contract, Plaintiffs do not cite which provisions were breached or otherwise discuss this issue in their complaint. We note that in a breach of contract action, the plaintiff's complaint "must cite, at a minimum, the contractual provision allegedly violated." *Ho v. State Farm Mut. Auto. Ins. Co.*, 926 F.Supp. 964, 968 (D.Hawai'i 1996), *aff'd in part and rev'd in part, Ho v. State Farm Ins. Cos.*, 117 F.3d 1425 (9th Cir. 1997) (unpublished opinion). Plaintiffs do not present any arguments based on D & T's employment contract in this appeal.

8. These "other services" apparently involved agricultural work on the Kohala land. Kohala does not appear to contend that D & T should have discovered that these services were improperly performed. Rather, Kohala asserted that, if D & T had discovered the fraud allegedly committed by Hawaiian Holiday concerning the trees,

"there is a strong likelihood that the other frauds and derelictions of Hawaiian Holiday ... would have been discovered [by Kohala] in early 1984."

9. Specifically, the complaint stated that Hawaiian Holiday performed agricultural work on the Keaau land in "a haphazard and fraudulent manner" and that certain land was not subleased to Keaau by Hawaiian Holiday, as Hawaiian Holiday allegedly agreed to do. Also, Keaau apparently did not receive all of the macadamia nut trees from Hawaiian Holiday for which Keaau had paid.

10. The complaint does not specify whether these individuals and entities received and relied on the 1983 and/or the 1984 Kohala report. On appeal, both Plaintiffs and D & T discuss the issue of D & T's duty to Keaau with respect to the 1983 Kohala report and thus, this is the issue we address also.

In response, D & T filed a counterclaim against Kohala, Keaau, Russell Johnson (R. Johnson), William E. Johnson, Jr. (W.Johnson), and Robert K. Dowd (Dowd) (collectively counterclaim defendants). In addition, D & T filed a third-party complaint against AP Enterprises, AP Development, and Pacific (collectively third-party defendants). D & T alleged that the counterclaim defendants and third-party defendants were negligent, that their negligence was the proximate cause of Plaintiffs' injuries, and thus sought contribution and/or indemnity for Plaintiffs' claims.

## C.

On July 16, 1993, D & T filed four motions for summary judgment requesting the following: (1) summary judgment against Plaintiffs on all claims relating to Keaau because "D & T was engaged to perform auditing services for Kohala only, and owed no duty, as a matter of law, to Keaau or its limited partners" (the Keaau summary judgment motion); (2) summary judgment against the limited partners of Kohala and Keaau because the limited partners as a matter of law were barred from maintaining an action on the same claims brought by their limited partnerships; (3) summary judgment against Bill Bledsoe (Bledsoe), Chapman Irrevocable Trust (Chapman), Michael Cohlmia (Cohlmia), Terry A. Darden (Darden), Dowd, Helen Rounsaville Hamilton (Hamilton), R. Johnson, Olin Lancaster (Lancaster), Larry Pascal (Pascal), Wayland Taylor, Sr. (Taylor Sr.), Wayland Taylor, Jr. (Taylor Jr.), and W.L. Tompson (Tompson) because, "as holders of interests in limited partners of Kohala and Keaau, [they] lacked standing to bring a claim identical to that which was brought on behalf of their partnership[s]"; and (4) summary judgment against Plaintiffs to the extent of payments made by Kohala prior to issuance of the 1983 Kohala report because D & T did not cause such losses.

The court granted these motions in a series of orders filed October 8, 1993 (collectively the four orders), each order granting one of D & T's motions.

First, the court granted summary judgment in favor of D & T and against Plaintiffs "on all claims brought by or on behalf of [Keaau] or any investors in [Keaau], including any claim arising from or relating to [Keaau] or the investors of [Keaau], on the ground that [D & T] owed no duty to [Keaau] or its investors" (the Keaau order).

Second, the court granted summary judgment in favor of D & T and against Plaintiffs "on all claims brought by a Plaintiff in his/her or its capacity as a limited partner of [Kohala] and/or [Keaau]" (the limited partners order). The court did not state its reasons.

Third, the court granted summary judgment in favor of D & T and against Bledsoe, Chapman, Cohlmia, Darden, Dowd, Hamilton, R. Johnson, Lancaster, Pascal, Taylor Sr., Taylor Jr., and Tompson "on all claims" (the Bledsoe order). Again, the court did not state its reasons, although it apparently accepted D & T's argument that these individuals did not have standing to assert the claims of limited partners of Kohala and/or Keaau.

Fourth, the court ruled that D & T could not be held liable "for damages arising from or relating to disbursements for macadamia nut trees and cultivation services made by [Kohala] before [D & T] issued its [1983 Kohala report.]" Therefore, the court granted summary judgment in favor of D & T on all claims for such damages, "including any claim for the alleged inability [of Kohala] to take corrective action" (the causation order).

## D.

On October 11, 1993, Plaintiffs moved for certification pursuant to Hawai'i Rules of Civil Procedure (HRCP) Rule 54(b) and for leave to file an interlocutory appeal pursuant to HRS § 641–1(b) with respect to all four orders.

On August 31, 1994, the court entered a written order (the certification/appeal order) which provided:

[T]he [c]ourt ... finding:

A. In regard to (1) [the Keaau order], (2) [the Bledsoe order], and (3) [the limited partners order], filed herein on October 8, 1993, there is no just reason for delay in the entry of final judgment on such orders; and

B. In regard to [the causation order] ...,
resolution of [this] issue on appeal at this
time is advisable and will result in a speed-
ier termination of this litigation;

C. Due to the fact that it is anticipated
that the trial herein will last six weeks,
that there appears to be no controlling law
in [Hawai'i] on the issues decided by the
foregoing orders, and that the resolution of
the remaining issues would require consid-
eration of facts relevant to the issues de-
cided by the foregoing orders, it is in the
best interests of the parties and the [c]ourt
to have these orders reviewed on appeal at
this time.

NOW, THEREFORE, IT IS HEREBY
ORDERED that:

1. Plaintiffs['] ... Motion for [HRCP
Rule] 54(b) certification and for Leave to
File an Interlocutory Appeal is hereby
granted;

2. *Judgment on (a) [the Keaau order],
(b) [the Bledsoe order], and (c) [the limited
partners' order], filed herein on October 8,
1993, shall be entered forthwith;*

3. *Appeal[ ] shall be allowed of [the cau-
sation order] ... pursuant to [HRS
§ 641–1(b) ];*

4. It is the intention of the [c]ourt and
the parties that there shall be an immedi-
ate appeal of the foregoing orders and,
therefore, to the extent one or more of
these orders should have been considered
under [HRS § 641–1(b) ] ... instead of
under [HRCP] Rule 54(b), or vice versa,
this order shall be deemed to have consid-
ered all of the foregoing orders to be re-
viewable under either standard.

**11.** Hawai'i Rules of Civil Procedure (HRCP) Rule
58 provides:

**Entry of Judgment.** Unless the court other-
wise directs and subject to the provisions of
[HRCP] Rule 54(b), judgment upon the verdict
of a jury shall be entered forthwith by the
clerk; but the court shall direct the appropri-
ate judgment to be entered upon a special
verdict or upon a general verdict accompanied
by answers to interrogatories returned by the
jury pursuant to [HRCP] Rule 49. When the
court directs that a party recover only money
or costs or that all relief be denied, the clerk
shall enter judgment forthwith upon receipt by
him of the direction; but *when the court directs*

5. Proceedings in this trial court relating
to this action shall be stayed pending the
outcome of the appeals.

(Emphases added.)

Also on August 31, 1994, the court entered
a partial final judgment which stated as fol-
lows:

Pursuant to [HRCP · Rule 58 [11]] and [the
Keaau order, the Bledsoe order, the limit-
ed partners order, and the certification/ap-
peal order], [j]udgment is hereby entered
in favor of [D & T] as follows:

A. *Against Plaintiffs [Bledsoe,* Chapman,
Cohlmia, Darden, Dowd, Hamilton, R.
Johnson, Lancaster, Pascal, Taylor Sr.,
Taylor Jr., and Tompson] on all matters;
and

B. *Against all [P]laintiffs on all claims
relating to [Keaau].*

This judgment does not dispose of all
claims of all parties as claims of [Kohala]
relating to audits done on its financial af-
fairs and [D & T's] claims asserted in its
counterclaim and third-party complaint re-
main. The [c]ourt finds, however, that
there is *no just reason for delay in the
entry of a final judgment in regard to the
orders described above.*

(Emphases added.)

 Despite this last statement in the par-
tial final judgment and the court's statement
in the certification/appeal order that judg-
ment "shall be entered forthwith" on the
Keaau, Bledsoe, and limited partners orders,
it is apparent from the face of the partial
final judgment that the court in fact entered
final judgment only as to the Bledsoe order
(in clause A of the partial final judgment [12])

*entry of judgment for other relief, the judge shall
promptly settle or approve the form of the judg-
ment and direct that it be entered by the clerk.*
The filing of the judgment in the office of the
clerk constitutes the entry of the judgment;
and the judgment is not effective before such
entry. The entry of the judgment shall not be
delayed for the taxing of costs. Every judg-
ment shall be set forth on a separate docu-
ment.

(Emphasis added.)

**12.** This clause tracks the language of the Bledsoe
order, except that in the Bledsoe order, the word
"claims" was used instead of the word "matters"
in the partial final judgment.

and the Keaau order (in clause B of the partial final judgment [13]), but not the limited partners order.[14] Likewise, the court did not enter judgment in favor of D & T and against all plaintiffs on the causation order. "[A]n order granting a motion for summary judgment is not a judgment unless it contains appropriate language entering judgment in favor of and against the relevant parties[.]" *Jenkins v. Cades Schutte Fleming & Wright,* 76 Hawai'i 115, 118, 869 P.2d 1334, 1337 (1994) (citing *M.F. Williams, Inc. v. City and County of Honolulu,* 3 Haw.App. 319, 322–24, 650 P.2d 599, 603 (1982)). Therefore, final judgment was not entered as to the limited partners order or the causation order.

Plaintiffs filed a notice of appeal on September 2, 1994 which noted their appeal from the August 31, 1994 partial final judgment, the Keaau order, the Bledsoe order, and the limited partners order. Plaintiffs filed an amended notice of appeal on September 8, 1994 in which they added an appeal from the causation order to their original notice of appeal.

However, Plaintiffs pursue only their appeal of the Keaau order and the causation order, informing us in their opening brief that "although [they] have appealed all four orders, they are pursuing their appeal as to only two of them[,]" the Keaau order and the causation order.

## II.

D & T contests our jurisdiction over Plaintiffs' appeal of the Keaau order and the causation order on the ground that the appeal of these two orders is untimely. We hold that Plaintiffs' appeal of the Keaau order was timely and proper, but we dismiss the appeal of the causation order as untimely.[15]

### A.

We examine the causation order first.

■ In its statement contesting jurisdiction, D & T contends that the causation order "has always been treated by the parties and [the][c]ourt as one for which interlocutory appeal under [HRS § 641–1(b) [16]] was proper." We concur, for in the certification/appeal order, the court purported to allow an interlocutory appeal of the causation order "pursuant to [HRS § ] 641–1(b)." In order to grant a party leave to file an interlocutory appeal under HRS § 641–1(b), "the trial court shall carefully consider the matter of whether it thinks an interlocutory appeal will more speedily determine the litigation and, if it so concludes, will set forth, in the order allowing the appeal, its reasons for that conclusion." *Mason v. Water Resources Int'l,* 67 Haw. 510, 511, 694 P.2d 388, 389 (1985). The court here specifically found that "resolution of [the causation issue] on appeal at this time is advisable and will result in a speedier termination of this litigation" in paragraph B of the certification/appeal order, and then set forth reasons for its conclusion in paragraph C of that order.

We note first that Hawai'i Rules of Appellate Procedure (HRAP) Rule 4(a)(1) requires a notice of appeal to be filed "within [thirty] days after the date of entry of the judgment or order appealed from." [17]

---

13. This clause apparently refers to the Keaau order, as that order granted summary judgment *"against Plaintiffs on all claims* brought by or on behalf of [Keaau] or any investors in [Keaau], including any claim arising from or *relating to [Keaau]* or the investors in [Keaau]...." (Emphases added.)

14. It is not explained in the record why final judgment was never entered as to the limited partners order.

15. Because Plaintiffs have not pursued their appeal as to the Bledsoe order and the limited partners order, we do not address whether appellate jurisdiction over those orders would be proper.

16. Hawai'i Revised Statutes (HRS) § 641–1(b) (1993) provides in pertinent part:

 Upon application made within the time provided by rules of court, an appeal in a civil matter may be allowed by a circuit court in its discretion ... from any interlocutory judgment, order, or decree whenever the circuit court may think the same advisable for the speedy termination of litigation before it.

17. Hawai'i Rules of Appellate Procedure (HRAP) Rule 4(a)(1) provides in pertinent part:

 In a civil case in which an appeal is permitted by law as of right from a court or agency or by an order of a court granting an interlocutory

■ The supreme court has explained when this thirty-day time period for filing the notice of appeal begins for interlocutory appeals taken pursuant to HRS § 641–1(b). "It is necessary for a party wanting to take an interlocutory appeal [pursuant to HRS § 641–1(b) ] to move for an order allowing the appeal, for the court to enter the order and for the appellant to file the notice of appeal *all within [thirty] days from the filing of the order appealed from* [as mandated by HRAP Rule 4(a)(1) [18]], unless the time for appeal is extended pursuant to [HRAP Rule] 4(a)(5)." *King v. Wholesale Produce Dealers Ass'n,* 69 Haw. 334, 335, 741 P.2d 721, 722 (1987) (emphasis added).[19] This thirty-day "time period [then] runs from the entry of the order [appealed from], not from the allowance of the appeal." *Id.* at 335, 741 P.2d at 722.

As we have recounted, the causation order was entered on October 8, 1993. Plaintiffs filed their motion for HRCP Rule 54(b) certification and for leave to file an interlocutory appeal from all four orders on October 11, 1993. However, the court did not enter a written order granting Plaintiffs' motion until August 31, 1994.[20] Plaintiffs filed their amended notice of appeal, which included the causation order, on September 8, 1994.

Accordingly, while the amended notice of appeal was filed within thirty days of the August 31, 1994 order allowing an interlocutory appeal of the causation order, this was nearly one year after the causation order was entered on October 8, 1993.

No extension of time for appeal pursuant to HRAP Rule 4(a)(5) appears in the record. As *King* demonstrates, Plaintiffs' appeal of the causation order is untimely because Plaintiffs should have obtained an order granting leave to file an interlocutory appeal and then filed their appeal all within thirty days of October 8, 1993.

In this case, as in *King,* the court did not enter its written order allowing an interlocutory appeal within thirty days of the entry of the order from which Plaintiffs wished to appeal, despite Plaintiffs' prompt motion for such an order. *Id.* at 334, 741 P.2d at 722. Nonetheless, the supreme court in *King* held that the notice of appeal filed ninety-one days after the entry of the order appealed from was untimely, affirming that the language of "HRAP Rule 4(a)(1) is clear and unambiguous." *Id.* at 334–35, 741 P.2d at 722. Therefore we conclude that Plaintiffs' appeal of the causation order was untimely and we are without jurisdiction of that appeal.

### B.

Our decision is not altered by Plaintiffs' contentions that the causation order was certified pursuant to HRCP Rule 54(b) [21] and

appeal or by a Rule 54(b), HRCP or [District Court Rules of Civil Procedure], certificate from the court appealed from, the notice of appeal required by [HRAP] Rule 3 shall be filed by a party with the clerk of the court or agency appealed from within [thirty] days after the date of entry of the judgment or order appealed from.

18. The current version of HRAP Rule 4(a)(1) was in effect at the time that *King v. Wholesale Produce Dealers Ass'n,* 69 Haw. 334, 741 P.2d 721 (1987) was decided and on October 8, 1993, when the four orders were entered in this case.

19. The supreme court has stated that *Jenkins v. Cades Schutte Fleming & Wright,* 76 Hawai'i 115, 869 P.2d 1334 (1994) (per curiam) overrules *King. Oppenheimer v. AIG Hawai'i Ins. Co.,* 77 Hawai'i 88, 93, 881 P.2d 1234, 1239 (1994). The discussion in *Oppenheimer,* however, indicates that *Jenkins* overruled only a part of *King.* The court in *King* held that a HRCP Rule "54(b) order makes a judgment final, both for purposes of execution and appeal, and, consequently, the

time for filing the notice of appeal runs from the entry of that order." *King,* 69 Haw. at 335, 741 P.2d at 722. In *Oppenheimer,* the court characterized *Jenkins* as holding that "after March 31, 1994, a party cannot appeal from a circuit court order even though the order may contain [HRCP Rule] 54(b) certification language; the order must be reduced to a judgment and the [HRCP Rule] 54(b) certification language must be contained therein." *Oppenheimer,* 77 Hawai'i at 93, 881 P.2d at 1239. Thus, the holding in *King* that a HRCP Rule 54(b) order makes a judgment final for purposes of appeal was overruled by *Jenkins.* This does not appear to disturb the holding in *King* with respect to HRS § 641–1(b).

20. The court apparently orally granted Plaintiffs' motion on October 12, 1993. There is no explanation in the record for why the court's written order was not entered until August 31, 1994.

21. HRCP Rule 54(b) provides in pertinent part: When more than one claim for relief is presented in an action, whether as a claim, coun-

thus the appeal was timely. We find no support in the record that the causation order was certified pursuant to HRCP Rule 54(b), despite the court's attempt to allow an appeal of all four orders under either HRS § 641–1(b) or HRCP Rule 54(b).[22]

"[A]n express determination that there is no just reason for delay [and] an express direction for the entry of judgment ... are required to make ... an order appealable" under HRCP Rule 54(b), yet neither is found in the causation order. *Mason*, 67 Haw. at 511, 694 P.2d at 389. While the court did find in the certification/appeal order that "there [was] no just reason for delay in the entry of a final judgment" on the Keaau, Bledsoe, and limited partners orders, it did not similarly refer to the causation order. The court directed in the certification/appeal order that judgment on the Keaau, Bledsoe, and limited partners orders "shall be entered forthwith" but made no similar direction for the causation order. These omissions are understandable in light of the court's finding that the appeal of the causation order should be allowed "pursuant to HRS § 641–1(b)" rather than HRCP Rule 54(b).

Furthermore, after March 31, 1994, an order certified under HRCP Rule 54(b) must be reduced to judgment and the language "no just reason for delay" must appear in the judgment in order to appeal. *Oppenheimer v. AIG Hawai'i Ins. Co.*, 77 Hawai'i 88, 93, 881 P.2d 1234, 1239 (1994). As noted above, the causation order was never reduced to final judgment, and thus Plaintiffs cannot appeal the causation order under HRCP Rule 54(b).

### C.

### 1.

■ While we do not have jurisdiction over the causation order, we do have jurisdic-

tion over the Keaau order. D & T, however, argues that because some of the Plaintiffs "have *claims* relating to both Kohala and Keaau" (i.e., the Kohala/Keaau investors), "the Keaau order does not dispose of a 'claim' or 'party' *in every situation*" and thus "cannot be certified as 'final' pursuant to [HRCP] Rule 54(b)." (Emphases added.) "Absent entry of final judgment as to all claims, an appeal may be taken ... only if leave to take an interlocutory appeal has been granted by the circuit court pursuant to HRS § 641–1(b) ... or if certification has been granted pursuant to HRCP Rule 54(b)." *Arthur v. Sorensen*, 80 Hawai'i 159, 162–63, 907 P.2d 745, 748–49 (1995) (footnote omitted). Hence, D & T maintains that the Plaintiffs' appeal of the Keaau order must be treated as an interlocutory appeal under HRS § 641–1(b) rather than an appeal from a HRCP Rule 54(b) certified order.

Since a notice of appeal from an interlocutory order must be filed within thirty days from the date the order being appealed is entered, *see supra* part II.A., D & T argues that Plaintiffs' appeal of the Keaau order is untimely. Because we disagree with the contention that the Keaau order was improperly certified under HRCP Rule 54(b), we reject D & T's argument that the appeal of the Keaau order was untimely.

### 2.

■ We review a court's decision to grant a HRCP Rule 54(b) motion for abuse of discretion. *FFG, Inc. v. Jones*, 6 Haw.App. 35, 45, 708 P.2d 836, 844 (1985). We do not believe that the court abused its discretion in certifying the Keaau order pursuant to HRCP Rule 54(b) and in entering partial final judgment on this order.

It is the intention of the [c]ourt and the parties that there shall be an immediate appeal of the foregoing orders and, therefore, to the extent one or more of these orders should have been considered under [HRS § 641–1(b)] ... instead of under [HRCP] Rule 54(b), or vice versa, this order shall be deemed to have considered all of the foregoing orders to be reviewable under either standard.

---

terclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment.

**22.** As previously set forth in the text *supra* part I.D., the court stated in the certification/appeal order that:

Before HRCP Rule 54(b) can be used to certify an order for appeal, "at least one 'claim' or all of the rights and liabilities of at least one party must be decided[.]" *Id.* In the Keaau order, the court granted summary judgment in favor of D & T and against Plaintiffs *"on all claims brought by or on behalf of [Keaau] or any investors in [Keaau],* including any claim arising from or relating to [Keaau] or the investors of [Keaau], on the ground that [D & T] owed no duty to [Keaau] or its investors." (Emphasis added.) On August 31, 1994, the court correspondingly entered judgment in favor of D & T and "against all [P]laintiffs on all claims relating to [Keaau]."

Based on the foregoing, D & T's argument that the Keaau order does not dispose of a claim or party "in every situation" is without merit. The Keaau investors were removed completely from the litigation by the Keaau order. Because their only interest in the action was as Keaau investors, all of their rights were decided by the Keaau order and the August 31, 1994 judgment, making HRCP Rule 54(b) certification permissible.[23]

Although D & T admits that certification under HRCP Rule 54(b) was proper with respect to the Keaau investors, D & T argues that the Keaau order was not properly certified under HRCP Rule 54(b) with respect to the Kohala/Keaau investors. Because the Kohala/Keaau investors' post-March 30, 1984 Kohala claims have not been dismissed, these investors have not been eliminated from the suit.

However, it suffices that "at least one 'claim' *or* all of the rights and liabilities of at least one party [were] decided" by the Keaau order for certification under HRCP Rule 54(b). *Id.* (emphasis added). The Keaau order decided *all claims* relating to Keaau; thus, even though the Kohala/Keaau investors (and Kohala, asserting Keaau's claims) were not entirely eliminated as parties by the Keaau order, their claims based on Keaau were decided by the Keaau order. Thus, certification under HRCP Rule 54(b) was allowable.

Furthermore, all of the requirements for an appeal following HRCP Rule 54(b) certification have been met. The Keaau order was reduced to judgment on August 31, 1994. *Oppenheimer,* 77 Hawai'i at 93, 881 P.2d at 1239. The court entered a finding of "no just reason for delay" in the August 31, 1994 judgment, which is the necessary language for HRCP Rule 54(b) certification. *Jenkins,* 76 Hawai'i at 120, 869 P.2d at 1339. Plaintiffs appealed within thirty days of the entry of the partial final judgment on the Keaau order.

Thus, we conclude that we properly have jurisdiction to address the appeal of the Keaau order.

### III.

### A.

In the Keaau order, the court granted summary judgment in favor of D & T and against Plaintiffs

on *all claims brought by or on behalf of [Keaau] or any investors in [Keaau],* including any claim arising from or relating to [Keaau] or the investors in [Keaau], *on the ground that [D & T] owed no duty to [Keaau] or its investors.*

(Emphases added.) Although the court did not specify what exactly was included by the words "all claims," in their summary judgment memoranda and briefs, Plaintiffs and D & T have addressed four claims that are potentially encompassed by this order. We must determine then if the court erred in granting summary judgment with respect to each of the claims relating to Keaau.

---

23. The four orders did not specify which parties and claims were removed from the lawsuit by which order. Instead, each of the four orders contained an identical summary of the remaining parties and claims. We note that the some of the Keaau investors (Bledsoe, Cohlmia, and Darden) were removed from the lawsuit by the Bledsoe order; the remaining Keaau investors (Carachelle, Hoffman, McGuire, and Wimmer) were, as limited partners of Keaau, removed by the limited partners order. However, the Keaau order in itself removed all of the Keaau investors by deciding all of their rights and liabilities, as required for HRCP Rule 54(b) certification.

## B.

We review an award of summary judgment "under the same standard applied by the circuit court." *Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*, 74 Haw. 85, 104, 839 P.2d 10, 22, *reconsideration denied*, 74 Haw. 650, 843 P.2d 144 (1992) (citation omitted). "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Id.* (citation and internal quotation marks omitted).

▮▮ Because "a negligence action lies only where there is a duty owed by the defendant to the plaintiff," *Birmingham v. Fodor's Travel Publications*, 73 Haw. 359, 366, 833 P.2d 70, 74 (1992) (citation omitted), the initial question is whether D & T owed a duty to Keaau and its investors. The supreme court has characterized duty as a question of

> whether the plaintiff's interest in freedom from [harm] is entitled to protection from defendant's conduct.... Duty, however, is a legal conclusion which depends upon "the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection." ... Therefore, in determining the duty imposed on the defendant, if any, we must weigh the considerations of policy which favor the plaintiff's recovery against those which favor limiting defendant's liability.

*Rodrigues v. State*, 52 Haw. 156, 169–70, 472 P.2d 509, 518–19 quoting Prosser, *Torts* § 53, at 332 (3d ed.1964), *reh'g denied*, 52 Haw. 283, 472 P.2d 509 (1970).

▮▮ "The existence of a duty ... is entirely a question of law." *Birmingham*, 73 Haw. at 366, 833 P.2d at 74 (citation omitted). Thus, as it is a question of law, we review the court's determination that D & T owed no duty to Keaau or its investors under the right/wrong standard. *Lee v. Corregedore*, 83 Hawai'i 154, 158, 925 P.2d 324, 328 (1996).

## IV.

We first examine summary judgment with respect to the two Keaau-related claims brought by the Keaau investors and the Kohala/Keaau investors. As previously mentioned, the Keaau investors claimed that they indirectly relied on the 1983 Kohala report in making their decision to invest in Keaau. Certain Kohala investors claimed that they directly relied on the 1983 Kohala report in deciding to invest in Keaau, thus becoming Kohala/Keaau investors.

But we need not address whether summary judgment against the Keaau investors and the Kohala/Keaau investors was proper, nor the question of what, if any, duty D & T owed to these investors, for the combined effect of the limited partners order and the Bledsoe order was to remove all of the Keaau investors and the Kohala/Keaau investors from this action, and Plaintiffs do not pursue these orders on appeal.

The parties listed as Keaau investors were Bledsoe, Carachelle, Cohlmia, Darden, Hoffman, McGuire, and Wimmer. The limited partners order removed Carachelle, Hoffman, McGuire, and Wimmer from the case and the Bledsoe order removed Bledsoe, Cohlmia, and Darden. Likewise, the limited partners order or the Bledsoe order removed the Kohala investors who invested in Keaau (the Kohala/Keaau investors). D & T did not contest Plaintiffs' decision to forego their appeal of the limited partners order and the Bledsoe order.[24] Hence, we do not consider these orders.

The remaining claims relating to Keaau were brought by Kohala, on behalf of Keaau itself, and are thus unaffected by the limited partners order and the Bledsoe order.

## V.

We next review summary judgment in connection with the allegation that Keaau relied on the 1983 Kohala report in deciding to contract with Hawaiian Holiday. Because Keaau was not a client of D & T's at the time

---

24. D & T mistakenly states in its answering brief that "[n]o appeal was taken with respect to [the limited partners order and the Bledsoe order]."

As we have recounted, Plaintiffs included these two orders in their notice of appeal, but chose not to proceed with an appeal of these orders.

the 1983 Kohala report was released,[25] we must determine under what circumstances an accountant can be held liable to a party who is not its client for alleged negligence in the preparation of an audit report. In other words, we consider the question of what duty an accountant owes to third parties in preparing and issuing audit reports.

For reasons discussed below, we believe that the scope of an accountant's duty to third parties is governed by section 552(2). We also hold that, under the principles expressed in section 552, there were genuine issues of material fact concerning whether D & T owed a duty to Keaau in issuing the 1983 Kohala report.

### A.

Since this issue has not been decided in Hawai'i, we look to the approaches examined and adopted by other jurisdictions in addressing an accountant's duty and hence potential liability to third parties. There are three doctrines[26] which have been applied: (1) privity; (2) foreseeability; and (3) section 552. We find the California Supreme Court's thorough decision in *Bily v. Arthur Young & Co.*, 3 Cal.4th 370, 11 Cal.Rptr.2d 51, 834 P.2d 745 (1992) to be particularly instructive in examining all three approaches.

### 1.

The New York Court of Appeals has developed a privity/near-privity standard for determining an accountant's liability to third parties. The New York court, speaking through Chief Judge Cardozo, established a privity requirement for claims alleging negligence by an accountant in *Ultramares Corp. v. Touche*, 255 N.Y. 170, 174 N.E. 441, 448 (1931). The plaintiff in *Ultramares* made loans to a company after reviewing the company's financial statements, which were audited by the defendant accounting firm. *Id.*

174 N.E. at 442–43. The company thereafter declared bankruptcy and the plaintiff sued the accounting firm, alleging that the audit was performed fraudulently and negligently and that the plaintiff relied on the audit report in making its loans to the company. *Id.* at 443. The court held that "if there has been neither reckless misstatement nor insincere profession of an opinion, but only honest blunder, the ensuing liability for negligence is one that is bounded by the contract, and is to be enforced between the parties by whom the contract has been made." *Id.* at 448.

The court recognized that the defendant knew its certified financial statements would be shown by the company to "banks, creditors, stockholders, purchasers, or sellers" and hence the defendant supplied thirty-two copies of the certified financial statements to the company. *Id.* at 442. However, "the range of the transactions in which a certificate of audit might be expected to play a part [was] ... indefinite and wide...." *Id.* Accordingly, the court expressed concern that "[i]f liability for negligence exists, a thoughtless slip or blunder, the failure to detect a theft or forgery beneath the cover of deceptive entries, may expose accountants to a liability in an indeterminate amount for an indeterminate time to an indeterminate class." *Id.* at 444.

When privity is absent, the New York Court of Appeals has held an accountant liable to a third-party "who relies to his [or her] detriment upon a negligently prepared financial report" *only* when the third-party's relationship with the accountant is "so close as to approach that of privity[.]" *Credit Alliance Corp. v. Arthur Andersen & Co.*, 65 N.Y.2d 536, 493 N.Y.S.2d 435, 436, 440, 483 N.E.2d 110, 111, 115 (1985) (quoting *Ultramares*, 174 N.E. at 446).[27] The court found

**25.** Indeed, Keaau was not even formed when D & T conducted the 1983 Kohala audit and issued the 1983 Kohala report.

**26.** In addition to the three doctrines applied by courts, several variations of these doctrines have been codified in six states to define the boundaries of an accountant's professional liability. *See* Ark.Code Ann. § 16–114–302 (Michie Supp. 1997); Ill.Ann.Stat. ch. 225, para. 450/30.1

(Smith–Hurd 1993); Kan. Stat. Ann. § 1–402 (Supp.1996); N.J. Stat. Ann. § 2A:53A–25 (West Supp.1997); Utah Code Ann. § 58–26–12 (Michie Supp.1996); and Wyo. Stat. Ann. § 33–3–201 (Michie 1997).

**27.** The court in *Ultramares Corp. v. Touche*, 255 N.Y. 170, 174 N.E. 441, 445–46 (1931) used this phrase to distinguish its holding in *Glanzer v. Shepard*, 233 N.Y. 236, 135 N.E. 275 (1922),

such a relationship in *White v. Guarente,* 43 N.Y.2d 356, 401 N.Y.S.2d 474, 479, 372 N.E.2d 315, 320 (1977). In *Guarente,* the accountants were retained to perform an audit of a limited partnership, pursuant to a requirement in the limited partnership agreement. *Guarente,* 401 N.Y.S.2d at 476–77, 372 N.E.2d at 317–18. The accountants knew that the audit would benefit the limited partners, in that the limited partners would rely on the audit to prepare their individual tax returns. *Id.* 401 N.Y.S.2d at 478, 372 N.E.2d at 319. Consequently, the court allowed one of the limited partners to recover from the accountant for negligently preparing the audit report, noting that the limited partner sought redress "as one of a settled and particularized class among the members of which the report would be circulated[.] for the specific purpose of fulfilling the limited partnership agreed upon arrangement." *Id.* at 479, 372 N.E.2d at 320.

In *Credit Alliance,* the court adopted a three-part test for determining when third parties not in privity with accountants may seek recovery from them for reliance on negligently prepared financial reports:

> from its holding requiring privity in *Ultramares.* In *Glanzer,* the seller of beans asked public weighers to certify the weight of the beans and then provide the seller and the buyer with copies of the weight. *Glanzer,* 135 N.E. at 275. The weight certificate stated that it was made by order of the seller for the use of the buyer. *Id.* When the weight of the purchased beans was revealed to be less than what was stated on the certificate, the court held the weighers liable for the overpayment by the buyer. *Id.* Judge Cardozo explained that while in *Ultramares,* the reliance by the plaintiff on the company's certified financial statement was "merely one possibility among many," the transmission of the weight certificate from the weigher to the buyer in *Glanzer* was the " 'end and aim of the transaction[.]' " *Ultramares,* 174 N.E. at 445. Thus, the "bond [between the weigher and the buyer] was so close as to approach that of privity, if not completely one with it." *Id.* at 446.

**28.** In setting forth this test, the New York Court of Appeals specifically rejected the standard provided by the *Restatement (Second) of Torts* § 552 (1977) (section 552), discussed *infra,* because section 552 does not require the third element of "linking." *Credit Alliance Corp. v. Arthur Andersen & Co.,* 65 N.Y.2d 536, 493 N.Y.S.2d 435, 444 n. 11, 483 N.E.2d 110, 119 n. 11 (1985).

(1) the accountants must have been aware that the financial reports were to be used for a particular purpose or purposes;
(2) in the furtherance of which a known party or parties was intended to rely; and
(3) there must have been some conduct on the part of the accountants linking them to that party or parties, which evinces the accountants' understanding of that party or parties' reliance.[28]

*Credit Alliance,* 493 N.Y.S.2d at 443, 483 N.E.2d at 118. The fear of the indeterminate liability which could result from a more relaxed rule, as expressed in *Ultramares,* apparently remained the rationale for the *Credit Alliance* test. *Id.* at 440–42, 443, 483 N.E.2d at 115–16, 118.

D & T, in apparent concern for "limitless dissemination for words and thoughts" and "indeterminate and disproportionate liability . . . befall[ing] accountants," urges this court to adopt the privity or near-privity standard of liability to third parties. In addition to New York, our research has revealed nine other state and federal decisions that have approved the privity/near-privity standard for determining an accountant's liability to third parties.[29]

**29.** *See Ackerman v. Schwartz,* 947 F.2d 841, 846 (7th Cir.1991) (Indiana law); *McLean v. Alexander,* 599 F.2d 1190, 1202 (3d Cir.1979) (finding that Delaware courts would apply a privity standard to a *fraud* claim against an accountant); *Stephens Indus. v. Haskins and Sells,* 438 F.2d 357, 359–60 (10th Cir.1971) (Colorado law); *Pasternak v. Colonial Equities Corp. (In re Colonial Ltd. Partnership Litigation),* 854 F.Supp. 64, 102 (D.Conn.1994) (Connecticut law); *Idaho Bank & Trust Co. v. First Bancorp of Idaho,* 115 Idaho 1082, 772 P.2d 720, 722 (1989); *Thayer v. Hicks,* 243 Mont. 138, 793 P.2d 784, 789 (1990) (adopting a modified version of the test set forth in *Credit Alliance,* 493 N.Y.S.2d at 443, 483 N.E.2d at 118); *Citizens Nat'l Bank of Wisner v. Kennedy and Coe,* 232 Neb. 477, 441 N.W.2d 180, 182 (1989); *Landell v. Lybrand,* 264 Pa. 406, 107 A. 783, 783 (1919); *Ward v. Ernst & Young,* 246 Va. 317, 435 S.E.2d 628, 631 (1993).

We note that some of the federal cases cited above, while not overruled, have been called into doubt to some extent by state court decisions. *See First Community Bank & Trust v. Kelley, Hardesty, Smith & Co.,* 663 N.E.2d 218, 224 (Ind.App.1996) (emphasizing that "Indiana courts have never adopted the *Ultramares* standard for accountants"); *Guardian Constr. Co. v. Tetra Tech Richardson, Inc.,* 583 A.2d 1378, 1386 (Del.Super.1990) ("conclud[ing] that privity of

2.

In sharp contrast to the courts requiring privity, courts in New Jersey, Wisconsin, and Mississippi have adopted foreseeability as the only limit on an accountant's liability to third parties for negligently preparing an audit report. In *Rosenblum v. Adler*, 93 N.J. 324, 461 A.2d 138, 153 (1983), the New Jersey Supreme Court held that an auditor has a duty to "all those whom that auditor should reasonably foresee as recipients from the company of the [audit report] for its proper business purposes, provided that the recipients rely on the [report] pursuant to those business purposes." While this holding has been legislatively overruled, *see* N.J. Stat. Ann. § 2A:53A–25 (West Supp.1997);[30] *Atlantic Paradise Assocs. v. Perskie, Nehmad & Zeltner*, 284 N.J.Super. 678, 666 A.2d 211, 213 n. 2 (App.Div.1995), *certif. denied*, 143 N.J. 518, 673 A.2d 276 (1996), the rationale of *Rosenblum* in adopting the foreseeability standard remains instructive.

The *Rosenblum* court discussed the elimination of the privity requirement for products liability cases, likened a negligent misrepresentation in an audit report to a negligent misrepresentation about a prod-

uct,[31] and concluded that a claim based on the former misrepresentation should not be barred merely by the lack of privity. *Rosenblum*, 461 A.2d at 145–47. The court also noted the well-known reliance of investors, creditors, and other third parties on accountants' audit reports, stating that the "auditor's function has expanded from that of a watchdog for management to an independent evaluator of the adequacy and fairness of financial statements issued by management to stockholders, creditors, and others." *Id.* at 149 (citations omitted). The court expressed the hope that its foreseeability rule would deter accountants' negligence by encouraging more thorough audits. *Id.* at 152.

In response to concerns of limitless liability resulting from a foreseeability rule, the *Rosenblum* court reasoned that the "extent of financial exposure [to liability] has certain built-in limits" including: (1) the plaintiff's burdens of proving both reliance on the negligent audit reports for a proper company purpose and proximate causation; (2) a limit on recovery to actual losses due to such reliance; (3) the plaintiff's comparative negli-

---

contract is not an indispensable prerequisite to the recovery of economic damages in negligence cases such as this which fall within the parameters of [section 552]"); *Wolther v. Schaarschmidt*, 738 P.2d 25, 27–28 (Colo.App.1986) (noting that the rationale of section 552 had been adopted by the Colorado Court of Appeals in an earlier case and holding that section 552 does not require privity). *Guardian* and *Wolther* did not involve claims against accountants.

30. In pertinent part, N.J. Stat. Ann. § 2A:53A–25 (West Supp.1997) provides:
 b. Notwithstanding the provisions of any other law, no accountant shall be liable for damages for negligence arising out of and in the course of rendering any professional accounting service unless:
 (1) The claimant against the accountant was the accountant's client; or
 (2) The accountant:
 (a) knew at the time of the engagement by the client, or agreed with the client after the time of the engagement, that the professional accounting service rendered to the client would be made available to the claimant, who was specifically identified to the accountant in connection with a specified transaction made by the claimant;
 (b) knew that the claimant intended to rely upon the professional accounting service in

connection with that specified transaction; and
 (c) directly expressed to the claimant, by words or conduct, the accountant's understanding of the claimant's intended reliance on the professional accounting service.

31. The New Jersey Supreme Court stated that "[i]t is clear that an action for negligence with respect to an injury arising out of a defective product may be maintained without privity. The negligence involved may be that ascribable to negligent misrepresentation." *Rosenblum v. Adler*, 93 N.J. 324, 461 A.2d 138, 146 (1983). The court then briefly discussed three cases involving negligent misrepresentations about a product: *Martin v. Bengue, Inc.*, 25 N.J. 359, 136 A.2d 626 (1957) (manufacturer's directions on ointment negligently misrepresented that the ointment could be used safely, when directions did not warn of the flammability of the ointment); *O'Donnell v. Asplundh Tree Expert Co.*, 13 N.J. 319, 99 A.2d 577 (1953) (defendant negligently represented to plaintiff's employer that safety belt hook was adequate for use by tree trimmers); and *Thomas v. Winchester*, 6 N.Y. 397 (1852) (drug manufacturer carelessly labeled deadly poison as harmless). *Rosenblum*, 461 A.2d at 146.

gence as a total or partial bar to recovery; (4) an accountant's ability to seek indemnification or contribution from the party responsible for the underlying problem in the audit report; and (5) an accountant's ability to include a disclaimer of responsibility in its audit reports. *Id.* Finally, the court approved of the foreseeability rule as a way to shift the loss resulting from the misrepresentation from the "innocent" investor or creditor to the negligent accountant, noting accountants' apparent ability to purchase insurance covering their potential liability under the federal securities laws. *Id.* at 151–52.

For similar reasons, the Wisconsin Supreme Court has ruled that accountants who negligently prepare audit reports will be liable "for the foreseeable injuries resulting from their negligent acts unless, under the facts of [the] particular case, as a matter of policy to be decided by the court, recovery is denied on grounds of public policy." [32] *Citizens State Bank v. Timm, Schmidt & Co.,* 113 Wis.2d 376, 335 N.W.2d 361, 366 (1983). The Wisconsin court adopted the foreseeability standard to protect third parties who rely on the accuracy of a company's audit reports, to deter negligent auditing, and to avoid increases in the cost of credit to the general public which the court believed would result if creditors were forced to absorb the cost of bad loans or perform their own audits. *Id.* 335 N.W.2d at 365. As in *Rosenblum,* the *Timm* court noted that accountants may better spread the risk of negligent audit reports by purchasing liability insurance. *Id.* The court held that "[t]he fundamental principle of Wisconsin negligence law ... that a tortfeasor is fully liable for all foreseeable consequences of his [or her] act except as those consequences are limited by policy factors" applied to the context of auditor liability to third parties also. *Id.* at 366.

The Wisconsin Supreme Court specifically rejected section 552 because its limitation on liability to certain third parties embodied "too restrictive a statement of policy factors for [the court] to adopt." *Id.* at 366. Subsequently, the Wisconsin Court of Appeals held that justifiable reliance, which is an element of the tort of negligent misrepresentation as defined by section 552(1) (*see infra* part V.A.3.a.), is *not* an element of that tort as defined by the Wisconsin courts. *Imark Indus. v. Arthur Young & Co.,* 141 Wis.2d 114, 414 N.W.2d 57, 64 (App.1987), *rev'd in part on other grounds,* 148 Wis.2d 605, 436 N.W.2d 311 (1989). It is clear from *Timm* and *Imark* that the definition of negligent misrepresentation set forth in section 552(1) is not Wisconsin's definition of that tort.

The foreseeability standard has also been adopted by the Mississippi Supreme Court to protect third parties who rely on audited financial statements. *Touche Ross & Co. v. Commercial Union Ins. Co.,* 514 So.2d 315, 322 (Miss.1987) (holding, however, that the accountant was not liable because the loss suffered was the result of criminal conduct occurring after the audit was completed).

Apparently no other state has found it prudent to endorse the foreseeability rule governing an accountant's liability in negligence to third parties. Also, although the dissenting opinion in *Bily* praised the continued existence of this rule as "eloquent testimony that [such a rule] does not destroy the accounting profession or otherwise have consequences demonstrably inimical to public welfare," *Bily,* 11 Cal.Rptr.2d at 89, 834 P.2d at 783, the foreseeability rule adopted in *Rosenblum* has, as we have pointed out, "succumbed to legislative abrogation." *Id.*

### 3.

#### a.

Negligent misrepresentation as defined in section 552 has been approved by a majority

---

**32.** The Wisconsin Supreme Court listed several public policy factors to be considered:

> (1) [t]he injury is too remote from the negligence; or (2) the injury is too wholly out of proportion to the culpability of the negligent tortfeasor; or (3) in retrospect it appears too highly extraordinary that the negligence should have brought about the harm; or (4) ... allow-

ance of recovery would place too unreasonable a burden on the negligent tort-feasor; or (5) ... allowance of recovery would be too likely to open the way for fraudulent claims; or (6) allowance of recovery would enter a field that has no sensible or just stopping point.

*Citizens State Bank v. Timm, Schmidt & Co.,* 113 Wis.2d 376, 335 N.W.2d 361, 366 (1983).

of courts [33] as "steer[ing] a middle course" between privity and foreseeability in cases alleging negligent misrepresentation by an accountant. *Bily*, 11 Cal.Rptr.2d at 58, 64–65, 834 P.2d at 752, 758–59. Section 552(1) establishes liability for negligently supplying information for the guidance of others, for their pecuniary loss caused by their justifiable reliance on the information:

> One who, in the course of his [or her] business, profession or employment, or in any other transaction in which he [or she] has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he [or she] fails to exercise reasonable care or competence in obtaining or communicating the information.

It follows then that "liability under [section 552] is based upon negligence of the actor in failing to exercise reasonable care or competence in supplying correct information." Section 552 comment a at 127. Thus, "the defendant is subject to liability if, but only if, he [or she] has failed to exercise the care or competence of a reasonable [person] in ob-

taining or communicating the information.... What is reasonable is, as in *other* cases of negligence, dependent upon the circumstances." *Id.* comment e at 130.

> If the matter is one that requires investigation, the supplier of the information must exercise reasonable care and competence to ascertain the facts on which his [or her] statement is based. He [or she] must exercise the competence reasonably expected of one in his [or her] business or professional position in drawing inferences from facts not stated in the information. He [or she] must exercise reasonable care and competence in communicating the information so that it may be understood by the recipient, since the proper performance of the other two duties would be of no value if the information accurately obtained was so communicated as to be misleading.

*Id.* comment f at 131–32.

Section 552(2) describes the scope of liability of a person subject to section 552:

> Except. as stated in Subsection (3),[34] the *liability* stated in Subsection (1) *is limited to loss suffered*

---

**33.** *See Bowers v. Allied Inv. Corp.*, 822 F.Supp. 835, 839 (D.Me.1993) (Maine law); *First Nat'l Bank of Commerce v. Monco Agency*, 911 F.2d 1053, 1061 (5th Cir.1990) (Louisiana law); *Ingram Indus. v. Nowicki*, 527 F.Supp. 683, 684 (E.D.Ky.1981) (Kentucky law); *Bunge Corp. v. Eide*, 372 F.Supp. 1058, 1062–63 (D.N.D.1974) (North Dakota law); *Rusch Factors, Inc. v. Levin*, 284 F.Supp. 85, 91–92 (D.R.I.1968) (Rhode Island law); *Boykin v. Arthur Andersen & Co.*, 639 So.2d 504, 509 (Ala.1994); *Standard Chartered P.L.C. v. Price Waterhouse*, 190 Ariz. 6, 28, 945 P.2d 317, 339 (App.1996), *as corrected after reconsideration denied*, (1997); *Bily*, 11 Cal. Rptr.2d at 77–79, 834 P.2d at 772–73; *First Florida Bank, N.A. v. Max Mitchell & Co.*, 558 So.2d 9, 14–15 (Fla.1990); *Badische Corp. v. Caylor*, 257 Ga. 131, 356 S.E.2d 198, 199–200 (1987); *Eldred v. McGladrey, Hendrickson & Pullen*, 468 N.W.2d 218 (Iowa 1991); *Law Offices of Lawrence J. Stockler, P.C. v. Rose*, 174 Mich.App. 14, 436 N.W.2d 70, 82 (1989), leave to appeal denied, 434 Mich. 862, 450 N.W.2d 270 (1990); *Bonhiver v. Graff*, 311 Minn. 111, 248 N.W.2d 291, 299 (1976); *MidAmerican Bank & Trust Co. v. Harrison*, 851 S.W.2d 563, 564–66 (Mo.Ct.App. 1993); *Spherex Inc. v. Alexander Grant & Co.*, 122 N.H. 898, 451 A.2d 1308, 1312 (1982); *Raritan River Steel Co. v. Cherry, Bekaert & Holland*, 322 N.C. 200, 367 S.E.2d 609, 617 (1988); *Had-*

*don View Inv. Co. v. Coopers & Lybrand*, 70 Ohio St.2d 154, 436 N.E.2d 212, 214–15 (1982); *ML–Lee Acquisition Fund, L.P. v. Deloitte & Touche*, 320 S.C. 143, 463 S.E.2d 618, 627 (App.1995), *aff'd in part and rev'd in part on other grounds*, 489 S.E.2d 470 (S.C.1997); *Bethlehem Steel Corp. v. Ernst & Whinney*, 822 S.W.2d 592, 595 (Tenn.1991) (adopted test modifying section 552); *Federal Land Bank Ass'n v. Sloane*, 825 S.W.2d 439, 442 (Tex.1991); *Haberman v. Washington Pub. Power Supply Sys.*, 109 Wash.2d 107, 744 P.2d 1032, 1067 (1987), *modified*, 109 Wash.2d 107, 750 P.2d 254 (1988); *First Nat'l Bank v. Crawford*, 182 W.Va. 107, 386 S.E.2d 310, 313 (1989). *But see Barrie v. V.P. Exterminators*, 625 So.2d 1007, 1014–16 (La.1993) (finding that "adopting one of the [three doctrines] as the sole method for determining liability for [the tort of negligent misrepresentation] is not necessary" because Louisiana courts use a "case by case application of the duty/risk analysis").

**34.** Subsection (3) of section 552 states that "[t]he liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them." Subsection (3) is not at issue in this case.

(a) *by the person or one of a limited group of persons for whose benefit and guidance he [or she] intends to supply the information or knows that the recipient intends to supply it; and*

(b) *through reliance upon it in a transaction that he [or she] intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.*

(Emphases added.)

■ In summary, "the liability of the maker of a negligent misrepresentation is limited to the transaction that he [or she] intends, or knows that the recipient intends, to influence, or a substantially similar transaction." Section 552 comment j at 137.

b.

The scope of the duty owed under section 552(2) has been preferred to the privity approach for situations in which "exoneration of the auditor ... [when the auditor] clearly intended to undertake the responsibility of influencing particular business transactions" may be unjust. *Bily,* 11 Cal.Rptr.2d at 74, 834 P.2d at 769. *See also Raritan River Steel Co. v. Cherry, Bekaert & Holland,* 322 N.C. 200, 367 S.E.2d 609, 615 (1988) (rejecting the privity rule as giving insufficient weight to the "heavy public reliance on audited financial information" and "the central role independent accountants play in the financial world").

At the same time, while section 552(2) allows liability to be imposed when the privity standard would not, this section also limits the imposition of liability well within the range of the foreseeability doctrine.[35] The authors of the *Restatement* have provided

two reasons why liability is limited with respect to third parties. First, the adoption of a more restricted rule of liability for negligent misrepresentation which results in solely pecuniary loss is necessary "because of the extent to which misinformation may be, and may be expected to be, circulated, and the magnitude of the losses which may follow from reliance upon it." Section 552 comment a at 127. *See also Prosser and Keeton on the Law of Torts* § 107, at 745 (W.P. Keeton 5th ed.1984) (stating that when "intangible economic interests are invaded [by negligent misrepresentations] ... [courts] have become alarmed at possible liability of unknown or virtually unlimited extent, and have developed a more restrictive rule [than foreseeability] ... limit[ing] ... the group of persons to whom the defendant may be liable, short of the foreseeability of possible harm").

Consistent with this concern about unlimited losses, some courts have found section 552 preferable to the foreseeability approach because section 552 protects accountants from "both unlimited and uncertain liability for economic losses in cases of professional mistake." *Bily,* 11 Cal.Rptr.2d at 74, 834 P.2d at 769; *see also Haberman v. Washington Pub. Power Supply Sys.,* 109 Wash.2d 107, 744 P.2d 1032, 1067 (1987), *modified,* 109 Wash.2d 107, 750 P.2d 254 (1988) (adopting section 552 "[i]n deference to legitimate fears of indeterminate liability to third persons").

[T]he foreseeable class of persons who can be adversely affected by reliance upon a lawyer or accountant's advice or opinion can be so large as to make liability to third parties a ruinous and catastrophic kind, a burden that cannot reasonably be imposed

---

**35.** Section 552 clearly does not impose liability based on mere foreseeability, as the following example demonstrates:

 10. A, an independent public accountant, is retained by B Company to conduct an annual audit of the customary scope for the corporation and to furnish his [or her] opinion on the corporation's financial statements. *A is not informed of any intended use of the financial statements; but A knows that the financial statements, accompanied by an auditor's opinion, are customarily used in a wide variety of financial transactions by the corporation and that they may be relied upon by lenders, inves-*

*tors, shareholders, creditors, purchasers, and the like, in numerous possible kinds of transactions.* In fact B Company uses the financial statements and accompanying auditor's opinion to obtain a loan from X Bank. Because of A's negligence, he [or she] issues an unqualifiedly favorable opinion upon a balance sheet that materially misstates the financial position of B Company, and through reliance upon it X Bank suffers pecuniary loss. A is *not liable* to X Bank.

Section 552 comment h, illustration 10 (emphases added).

on the lawyer or the accountant except for fraud or other intentional misconduct.

*Prosser and Keeton on the Law of Torts* § 107, at 747 (W.P. Keeton 5th ed.1984).

Second, the authors of the *Restatement* explained that the scope of liability for negligent misrepresentations is narrower than that for fraudulent misrepresentations because of the correspondingly lesser degree of fault for negligent misrepresentations. Section 552 comment a at 127–28. The maker of a negligent misrepresentation violates the duty of care while the maker of a fraudulent misrepresentation violates the duty of honesty. *Id.* Liability for fraudulent misrepresentations is broad because

> [a]ny user of commercial information may reasonably expect the observance of [the duty of honesty] by a supplier of information to whom his [or her] use is reasonably foreseeable.
>
> On the other hand, it does not follow that every user of commercial information may hold every maker to a duty of care. Unlike the duty of honesty, the duty of care to be observed in supplying information for use in commercial transactions implies an undertaking to observe a relative standard, which may be defined only in terms of the use to which the information will be put, weighed against the magnitude and probability of loss that might attend that use if the information proves to be incorrect. A user of commercial information cannot reasonably expect its maker to have undertaken to satisfy this obligation *unless the terms of the obligation were known to [the maker].* Rather, one who relies upon information in connection with a commercial transaction may reasonably expect to hold the maker to a duty of care *only in circumstances in which the maker was manifestly aware of the use to which the information was to be put and intended to supply it for that purpose.*

*Id.* at 128 (emphases added).

In addition to section 552(2) providing "a satisfactory compromise between ... discomfort with the traditional privity approach and the 'specter of unlimited liability'" that accompanies the foreseeability rule, the California Supreme Court has articulated several additional reasons for its adoption of section 552(2) in holding that certain nonclients, as delimited in section 552(2), may bring an action for negligent misrepresentation.[36] *Bily,* 11 Cal.Rptr.2d at 65, 73, 78, 834 P.2d at 759, 767, 773. The approach taken by section 552(2), characterized by the California Supreme Court as "the intent-to-influence" approach, puts the auditor on "notice of potential third-party claimants, thereby allowing [the auditor] to ascertain the potential scope of its liability and make rational decisions regarding the undertaking." *Id.* 11 Cal. Rptr.2d at 74, 834 P.2d at 769. Also, requiring a closer connection between the auditor and third parties "ameliorat[es] otherwise difficult concerns of causation and of credible evidence of reliance." *Id.* Finally, the third parties who would be prohibited under section 552(2) from maintaining an action for negligent misrepresentation could establish direct communication with an auditor, in order to bring themselves within the scope of section 552(2). *Id.*

Comment a of section 552 notes another important benefit of the *Restatement* approach:

> By limiting the liability for negligence of a supplier of information to be used in commercial transactions to cases in which he [or she] *manifests an intent* to supply the information for the sort of use in which the plaintiff's loss occurs, the law promotes the important social policy of encouraging the flow of commercial information upon which the economy rests.

Section 552 comment a at 128 (emphasis added).

The Texas Court of Appeals has interpreted section 552 more expansively than other courts adopting the *Restatement* approach by holding accountants liable for what they *should* know regarding the reliance by nonclients on their audit reports. *See Blue Bell, Inc. v. Peat, Marwick, Mitchell & Co.,* 715

36. The California Supreme Court did not endorse other provisions of section 552, stating that the tort of negligent misrepresentation in California is "prescribed by statute ... and ... common law tradition." *Bily,* 11 Cal.Rptr.2d at 79, 834 P.2d at 773.

S.W.2d 408, 412, *reh'g. denied,* 715 S.W.2d 408 (Tex.Ct.App.1986). In *Blue Bell,* the Texas court held that

> if under current business practices and the circumstances of that case, an accountant preparing audited financial statements knows *or should know* that such statements will be relied upon by a limited class of persons, the accountant may be liable for injuries to members of that class relying on his [or her] certification of the audited reports....
>
> [W]e conclude that the apparent attempt ... to limit the class of third parties who may recover to those actually and specifically known by the defendant is too artificial a distinction.... To allow liability to turn on the fortuitous occurrence that the accountant's client specifically mentions a person or class of persons who are to receive the reports, when the accountant may have that same knowledge as a matter of business practice, is too tenuous a distinction for us to adopt as a rule of law.

*Id.* (emphasis in original). We are not aware of any other decision expanding section 552 in this manner.

### B.

In *Chun v. Park,* 51 Haw. 462, 468, 462 P.2d 905, 909 (1969), the Hawai'i Supreme Court recognized the tort of negligent misrepresentation as set forth in section 552.[37] *State by Bronster v. U.S. Steel Corp.,* 82 Hawai'i 32, 40–41, 919 P.2d 294, 302–03 (1996). The supreme court recently reaffirmed section 552(1) as defining the tort of negligent misrepresentation in Hawai'i, noting that "[t]he duty imposed by [section 552] is ... to exercise reasonable care or competence in obtaining or communicating information for the guidance of others in their business transactions." *Id.* at 40–41, 919 P.2d at 302–03.

In *Chun,* the Hawai'i Supreme Court applied section 552(2) and held a land title company, employed by the sellers only, liable

to the buyers and the lending institution for negligent misrepresentations made in the title search, despite a lack of privity between the plaintiffs and the title company. *Chun,* 51 Haw. at 464–65, 468, 462 P.2d at 906–07. In another case involving the sale of real property, this court held that real estate brokers representing the sellers may be held liable to the buyer for negligent misrepresentations under section 552. *Shaffer v. Earl Thacker Co.,* 6 Haw.App. 188, 191–92, 716 P.2d 163, 166 (1986).

While neither the supreme court nor this court has yet addressed the application of section 552 specifically to cases alleging negligent misrepresentations by accountants, the United States District Court for the District of Hawai'i has held that "[a]n accountant or auditor breaches his [or her] professional obligations if, in performing his [or her] services, he [or she] makes negligent misrepresentations." *In re Hawaii Corp.,* 567 F.Supp. 609, 617 (D.Hawai'i 1983). The District Court found that section 552 provides the standard of liability for negligent misrepresentations, noting that the Hawai'i Supreme Court adopted the *Restatement* definition of negligent misrepresentations in *Chun. Id.* The District Court did not discuss the issue of an accountant's liability in negligence to nonclients.

We now hold that an accountant may be held liable to third parties under section 552(2) for negligence in the preparation of an audit report. The Hawai'i courts have already applied the definition of negligent misrepresentation contained in section 552(1) and the scope of liability set forth in section 552(2) to cases involving alleged negligence by other professionals, and we see no reason for applying a different standard to a case involving alleged negligence by accountants.

In addition, we are not persuaded by Plaintiffs' argument that we should adopt a foreseeability standard for negligence cases involving accountants. The supreme court has rejected foreseeability as the basis for

---

**37.** As noted by the supreme court in *State by Bronster v. U.S. Steel Corp.,* 82 Hawai'i 32, 41, 919 P.2d 294, 303 (1996), in *Chun v. Park,* 51 Haw. 462, 462 P.2d 905 (1969), the supreme court actually relied upon section 552 (Tentative Draft No. 12, 1966). However, in *U.S. Steel* the supreme court stated that the version of section 552 in Tentative Draft No. 12 is the same as the version published in 1977.

creating a special relationship which gives rise to a duty to prevent harm. *Lee,* 83 Hawai'i at 167, 925 P.2d at 337. The supreme court criticized foreseeability as too broad, commenting that "[f]oreseeability is endless because it, like light, travels indefinitely in a vacuum" and "[f]oreseeability alone proves too much." *Id.* " '[T]here are clear judicial days on which a court can foresee forever and thus determine liability but none on which that foresight alone provides a socially and judicially acceptable limit on recovery of damages for that injury.' " *Id.* (quoting *Thing v. La Chusa,* 48 Cal.3d 644, 257 Cal.Rptr. 865, 881, 771 P.2d 814, 830 (1989)).

Nor are we moved to adopt a privity standard as urged by D & T. Privity has already been rejected by our courts in *Chun* and *Shaffer,* and D & T presents no persuasive argument for shielding accountants to a greater extent than title search companies or real estate brokers.

We also decline to interpret section 552(2) more expansively, as was done by the Texas Court of Appeals in *Blue Bell,* because we find the reasons given by the authors of the *Restatement* persuasive for restricting liability to those persons *known* to an accountant to be receiving the information.

### C.

Although Plaintiffs did not use the term "negligent misrepresentation" in their complaint, Keaau's claim amounts to a claim for negligent misrepresentation under section 552. As previously set out, Plaintiffs' complaint declared that D & T "failed to exercise reasonable care in verifying" that Kohala possessed the grafted macadamia nut trees it had paid for, and thus D & T's 1983 Kohala report "was misleading and inaccurate when it stated that Kohala possessed $936,000 worth of macadamia nut trees, because those trees did not exist at that time." The complaint further alleged facts indicating that Keaau relied on the 1983 Kohala report and thereafter suffered loss by contracting with Hawaiian Holiday.

 D & T argues that section 552 is not applicable because Plaintiffs did not ex-

pressly allege that D & T supplied or intended to supply the 1983 Kohala report to Keaau or its investors. However, Plaintiffs were not required to make such an allegation to state a claim for negligent misrepresentation under section 552. While section 552 "subjects the negligent supplier of misinformation to liability only to those persons for whose benefit and guidance it is supplied[,] ... [i]t is enough ... that the maker of the representation *knows that his [or her] recipient intends to transmit the information* to [such persons]." Section 552 comment h at 133. In their complaint, Plaintiffs alleged that D & T "knew [a co-general partner of Keaau] would receive and rely on copies of the audited financial statement." Similarly, Plaintiffs claimed that D & T "knew or ought to have known" that the principals in Keaau's general partners and the Kohala/Keaau investors would receive and rely on the 1983 Kohala report. These allegations were sufficient to state a claim for negligent misrepresentation under the principles of section 552.

### D.

As stated previously, the supplier of information owes a duty of reasonable care and competence in obtaining and communicating that information to persons who fall within the scope of section 552(2). Applying section 552(2) to the instant facts, D & T owed a duty to Keaau only if (a) the principals of Keaau were the persons or part of a limited group of persons for whose benefit and guidance D & T intended to supply the 1983 Kohala report *or* to whom D & T knew Kohala intended to supply it; and (b) the principals of Keaau relied on the information in the 1983 Kohala report in contracting with Hawaiian Holiday, which was a transaction that D & T intended the 1983 Kohala report to influence *or* knew that Kohala so intended *or* was a substantially similar transaction. We must determine then whether there were any "disputed facts ... that, if proved, would have the effect of 'establishing or refuting' the existence" of such a duty owed by D & T and whether D & T was "entitled to judgment as a matter of law" under section 552. *Maguire v. Hilton Hotels Corp.,* 79 Hawai'i 110, 112, 899 P.2d 393, 395 (1995).

### 1.

■■■■ As the party moving for summary judgment, the burden was on D & T "to show the absence of any genuine issue as to all material facts, which, under [section 552], entitle[d][D & T] to judgment as a matter of law." *GECC Financial Corp. v. Jaffarian,* 79 Hawai'i 516, 521, 904 P.2d 530, 535 (App.1995), *modified on other grounds,* 80 Hawai'i 118, 905 P.2d 624 (1995). In support of its Keaau summary judgment motion, D & T attached the affidavits of John T. Marrack (Marrack) and Carleton L. Williams (Williams), D & T's partner in charge and manager, respectively, of the 1983 Kohala audit.[38]

The affidavits are nearly identical and state the following facts: D & T was engaged to perform the 1983 Kohala audit solely by Kohala; the 1983 Kohala report was prepared solely for Kohala and not at the direction of or for the benefit of Keaau, its investors, or the attorneys who prepared the private placement memorandum for Keaau; Marrack and Williams were not aware and had no reason to be aware that the 1983 Kohala report would be provided to Keaau, its investors, or the attorneys; Marrack and Williams were not aware and had no reason to be aware that Keaau would rely on the 1983 Kohala report in contracting with Hawaiian Holiday, or that any potential Keaau investor would rely on the 1983 Kohala report in deciding to invest in Keaau, or that the attorneys would rely on the 1983 Kohala report in preparing the private placement memorandum for Keaau; and Marrack and Williams did not have any meetings or communication with Keaau, its investors, or the attorneys "regarding their reliance" on the 1983 Kohala report, nor did Marrack and Williams intend to supply information in the 1983 Kohala report for the benefit of Keaau, its investors, or the attorneys.

We believe that these affidavits, on their face, initially satisfied D & T's burden to demonstrate that there was no genuine issue

as to any fact which would establish that D & T owed a duty to Keaau under section 552. Marrack and Williams, the employees of D & T in charge of the 1983 Kohala audit, stated that they did not intend to supply the information in the 1983 Kohala report for the benefit or guidance of Keaau, and did not know that the 1983 Kohala report would be supplied to Keaau by Kohala, or that Keaau would rely on the 1983 Kohala report in contracting with Hawaiian Holiday. These statements, if taken as true, would mean that Keaau was not among the limited group of third parties who could recover from D & T for negligent misrepresentation as set forth in section 552(2).

### 2.

After D & T satisfied its preliminary burden, the burden shifted to Plaintiffs to respond and "demonstrate specific facts, as opposed to general allegations, that present a genuine issue worthy of trial." *GECC Financial Corp.,* 79 Hawai'i at 521, 904 P.2d at 535 (citing 10A C. Wright, A. Miller & M. Kane, *Federal Practice & Procedure: Civil* § 2727, at 148 (2d ed.1983)). "[T]he inferences to be drawn from the underlying facts alleged in the materials (such as depositions, answers to interrogatories, admissions and affidavits) considered by the court in making its determination must be viewed in the light most favorable to the party opposing the motion." *Miller v. First Hawaiian Bank,* 61 Haw. 346, 348, 604 P.2d 39, 41 (1979). Granting Plaintiffs this favorable viewing of the facts, we conclude that Plaintiffs have demonstrated that genuine issues of material fact existed, and thus summary judgment on Keaau's claim based on the 1983 Kohala audit was improper.

■■■■ The only affidavit submitted by Plaintiffs in opposition to the Keaau summary judgment motion was from Plaintiffs' counsel, stating that each of the exhibits

---

38. D & T also submitted, as an attachment to its reply memorandum concerning the Keaau summary judgment motion, a copy of an order from the court granting summary judgment in another, unrelated case on the ground that there was no privity of contract between the accountant and the plaintiff in that case. We decline to consider this order at all, as the facts of that case are unknown to us and in any event, prior decisions of the circuit courts are not binding on this court.

attached to the affidavit were true and accurate copies of the original documents.[39] As an initial matter, we note that none of the exhibits were properly certified under HRCP Rule 56(e),[40] which provides that "[s]worn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith." Because a motion for summary judgment may be decided only on the basis of admissible evidence, *Munoz v. Yuen*, 66 Haw. 603, 605, 670 P.2d 825, 826 (1983) (per curiam), these "papers" attached to an affidavit must be admissible in evidence. "To be admissible, documents must be authenticated by and attached to an affidavit that meets the requirements of [Federal Rules of Civil Procedure] Rule 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence." 10A C. Wright, A. Miller & M. Kane, *Federal Practice & Procedure: Civil* § 2722, at 58–60 (2d ed.1983) (footnotes omitted); *see also Fuller v. Pacific Medical Collections*, 78 Hawai'i 213, 224, 891 P.2d 300, 311 (App.1995). There is no indication that Plaintiffs' counsel, the affiant, was a person through whom any of the attached exhibits could have been admitted into evidence.

However, we nonetheless consider some of these exhibits. We will consider exhibits C, I, M, and N because these exhibits have been specifically referred to by D & T without any objection as to their content,[41] which we take as an indication of D & T's apparent agreement that exhibits C, I, M, and N are indeed true and correct copies of the 1983 Kohala report, the report by Plaintiffs' expert, Stanley Scott, and the Marrack and Williams deposition excerpts, respectively. We also consider exhibits A, the 1982–83 Hawaiian Holiday report, and E, the 1984 Keaau report, because they were prepared by D & T and D & T did not object to the copies of them attached to Plaintiffs' counsel's affidavit. *See Tradewind Ins. Co. v. Stout*, 85 Hawai'i 177, 181, 938 P.2d 1196, 1200 (App.) (considering facts that the parties apparently agreed to as indicated in their memoranda and statements at the summary judgment hearing), *cert. denied*, 85 Hawai'i 81, 937 P.2d 922 (1997); 10A C. Wright, A. Miller & M. Kane, *Federal Practice & Procedure: Civil* § 2722, at 60 (2d ed.1983) (stating that uncer-

---

39. Exhibit A is a copy of D & T's review report of Hawaiian Holiday's balance sheets for the years ending March 31, 1982 and March 31, 1983, dated July 8, 1983. Exhibit B is an excerpt of the deposition of W. Johnson. Exhibit C is a copy of the 1983 Kohala report. Exhibit D is a portion of the Confidential Private Placement Memorandum for Keaau. Exhibit E is a copy of the 1984 Keaau report. Exhibit F is a copy of the Kohala Limited Partnership Agreement. Exhibit G is an excerpt of the deposition of Dan Jackson (Jackson), an expert retained by Plaintiffs. Exhibit H is a copy of the Macadamia Nut Sales and Planting Agreement entered into by Hawaiian Holiday and Kohala. Exhibit I is a copy of the report by Stanley Scott (Scott), another expert retained by Plaintiffs. Exhibit J is an excerpt of the deposition of Roach. Exhibit K is an excerpt of the deposition of Lancaster. Exhibit L is a copy of Jackson's report to Plaintiffs' attorney, dated June 18, 1993. Exhibit M is an excerpt of the deposition of John T. Marrack (Marrack). Exhibit N is an excerpt of the deposition of Carleton L. Williams (Williams). Exhibits O and P are the lists of limited partners of Kohala and Keaau, respectively, as filed with the Certificates of Amendment of Limited Partnership for Kohala and Keaau.

40. HRCP Rule 56(e) provides:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

HRCP Rule 56(e) is substantially similar to Federal Rules of Civil Procedure Rule 56(e).

41. D & T referred to exhibit C, the 1983 Kohala report, twice in their answering brief. D & T attached another copy of exhibit I, Scott's report, to its motion in limine regarding Plaintiffs' experts, dated October 7, 1993. D & T referred to exhibits M and N, the excerpts of Marrack's and Williams' depositions, in their reply memorandum for the Keaau summary judgment motion.

tified or otherwise inadmissible documents may be considered if not challenged).

Exhibits M and N as previously noted are excerpts from Marrack's and Williams' depositions. Plaintiffs argue that these excerpts create a genuine issue of material fact because they cast doubt on the credibility of the affidavits of Marrack and Williams.

> Doubts as to the credibility of the movant's affiants ... may lead the court to conclude that a genuine issue exists. ... [F]or example, if conflicting testimony appears in affidavits and depositions that are filed, summary judgment may be inappropriate as the issues involved will depend on the credibility of the witnesses.

10A C. Wright, A. Miller & M. Kane, *Federal Practice & Procedure: Civil* § 2726, at 113, 116 (2d ed.1983) (footnotes omitted).

### 3.

An examination of the relationship of the individuals and entities involved leads us to the conclusion that inconsistencies between Marrack's and Williams' deposition responses and their unqualified affidavit assertions created genuine issues of material fact as to whether D & T owed a duty to Keaau with respect to the 1983 Kohala report.

Viewing facts in the light most favorable to Plaintiffs, we believe there is a genuine issue of material fact as to whether D & T knew Kohala intended the 1983 Kohala report to be supplied to the Keaau principals for the benefit and guidance of Keaau.

D & T prepared the 1983 Kohala report. This report was addressed to the Kohala partners. Orchard was a partner of Kohala's general partner. Orchard became one of the general partners of Keaau.

Keaau was formed after the issuance of the 1983 Kohala report. The principals of Keaau were many of the same persons or entities involved in Kohala, who received the 1983 Kohala report.

Again viewing facts in the light most favorable to Plaintiffs, we believe there is a genuine issue of material fact as to whether D & T knew that Kohala intended Keaau to rely upon the 1983 Kohala report in contracting with Hawaiian Holiday.

As indicated, Kohala had contracted with Hawaiian Holiday, and the principals of Kohala who received the 1983 Kohala report were many of the same persons and entities involved in the formation of Keaau. Hence, D & T's 1983 Kohala report was supplied to persons and entities who formed Keaau, which subsequently contracted with Hawaiian Holiday.

The 1983 Kohala report described Kohala's agreement with Hawaiian Holiday as being "for the purchase and planting of grafted macadamia nut trees and [for the] sale of all [Kohala's] harvested macadamia nuts to [Hawaiian Holiday] at agreed upon prices."

Keaau contracted with Hawaiian Holiday in the same way. The 1984 Keaau report described Keaau's agreement with Hawaiian Holiday as being "for the purchase and planting of grafted macadamia nut trees and for the sale of all of [Keaau's] harvested macadamia nuts to [Hawaiian Holiday] at agreed upon prices." D & T characterized these transactions in both reports as "related party transactions."

D & T knew that Hawaiian Holiday had contracted with HMO and Kohala for Hawaiian Holiday to provide various services and macadamia nut trees,[42] and that Hawaiian Holiday was to receive a supply of harvested macadamia nuts and did receive substantial payments from HMO and Kohala in return.[43]

**42.** The 1982–83 Hawaiian Holiday report reveals that Hawaiian Holiday sold macadamia nut tree orchards and subleased the underlying land to Hawaiian Macadamia Orchard (HMO), and entered into contracts with HMO to manage the orchards and provide more macadamia nut trees. As noted above, the 1983 Kohala report described Kohala's agreement with Hawaiian Holiday "for the purchase and planting of grafted macadamia nut trees and [for the] sale of all

[Kohala's] harvested macadamia nuts to [Hawaiian Holiday] at agreed upon prices."

**43.** The orchard sale to HMO yielded $756,000 to Hawaiian Holiday. Hawaiian Holiday also received $400,000 for services and a $231,000 note receivable for the trees from HMO. In 1983, Kohala paid the following sums to Hawaiian Holiday: $1,920,000 for land clearing services, $936,000 for macadamia nut trees, $20,000 for

A pattern of creating limited partnerships as vehicles for the production of macadamia nuts and a stream of income for Hawaiian Holiday would seem apparent from D & T's 1982–83 Hawaiian Holiday report, HMO audits in 1982 and 1983, and the 1983 Kohala audit. The formation of Keaau and Keaau's contracting with Hawaiian Holiday were consistent with this pattern.

In his deposition, Marrack could not remember whether he knew at the time of the 1983 Kohala audit that there would be additional limited partnership syndications [44] by Hawaiian Holiday—that is, Keaau. Williams also was unable to recall whether or not he knew in advance that Hawaiian Holiday would be selling limited partnership interests in Keaau. Williams could not recall "one way or the other" whether he was advised that the 1983 Kohala report needed to be completed before there could be an offering of Keaau. Thus, Marrack and Williams could not recall at the time of their depositions whether they knew while conducting the 1983 Kohala audit that Keaau would be formed.

But by the time they provided their affidavits, Marrack and Williams asserted unequivocally that they were not aware and had no reason to be aware that the 1983 Kohala report would be provided to Keaau.

From the foregoing, we believe that questions of fact existed as to whether D & T knew that the information in the 1983 Kohala report was intended to be supplied to the principals of Keaau, many of whom were the same persons or entities involved in Kohala, and as to whether Keaau's contracting with Hawaiian Holiday in alleged reliance on the 1983 Kohala report was a transaction that D

& T knew that the principals of Kohala intended the 1983 Kohala report to influence. The differing memories of Marrack and Williams cast sufficient doubt on D & T's affidavits to persuade us that summary judgment with respect to the claim that Keaau suffered injury because it justifiably relied on the 1983 Kohala report was inappropriate. These credibility disputes are best resolved at trial.

## VI.

Finally, Plaintiffs contended that the Keaau order was also erroneous because it embodied a ruling that the complaint failed to state a claim for negligence in connection with the 1984 Keaau audit.[45] Initially, we note that the Keaau order does not specifically indicate that the court in fact concluded that the complaint failed to state a claim regarding the 1984 Keaau audit.

At the same time, no claim in the complaint expressly refers to the 1984 Keaau audit or report. The claims of injury to Kohala, the Kohala investors, Keaau, the Keaau investors, and the Kohala/Keaau investors all appear to be premised on their alleged reliance on the 1983 and 1984 Kohala reports. Nevertheless, in their opening brief, Plaintiffs argued that "[i]t is beyond dispute that the complaint gave [D & T] fair notice that [P]laintiffs have asserted claims against it based upon the [1984 Keaau audit]." In support of this contention Plaintiffs cited the allegation that Keaau was in "privity" with D & T.[46] The first time, however, that Plaintiffs expressly referred to the 1984 Keaau audit as having "similar defects" to the 1983 and 1984 Kohala audits was in their pretrial statement.

---

chemicals and fuel, $17,000 for labor costs, and $7800 for dedication costs.

**44.** A syndication is defined as follows:

An association of individuals, formed for the purpose of conducting and carrying out some particular business transaction, ordinarily of a financial character, in which the members are mutually interested. An organization formed for some temporary purpose, such as the organization of a real estate trust and the sale of shares to the public. Syndicates may exist as

corporations or partnerships (either general or limited).

*Black's Law Dictionary* 1450 (6th ed.1990).

**45.** Plaintiffs did not dispute that the 1983 Kohala audit was at issue with respect to the Keaau summary judgment motion. Plaintiffs argued that the 1984 Keaau audit was at issue also.

**46.** The complaint stated that "[Keaau] was in privity with [D & T], and [D & T] knew or ought to have known that [Keaau], its principals or its limited partners would be relying on [D & T's] audited financial reports of Kohala."

To demonstrate that D & T had notice of their 1984 Keaau audit claims, Plaintiffs pointed to D & T's third-party complaint and counterclaim which acknowledged that D & T performed an audit of Keaau for the period ending December 31, 1984. Such an acknowledgement would not necessarily indicate that D & T was on notice that Keaau (through Kohala, its successor in interest) asserted a *claim* against D & T based on the 1984 Keaau audit.

Plaintiffs also referred to D & T's pretrial statement, which declared that this case "involves claims of alleged negligence in the audits of [Kohala] and [Keaau]." On appeal, D & T attempted to minimize this acknowledgement of the 1984 Keaau audit as "an inadvertent misstatement."

■■■ HRCP Rule 8(a)(1) requires a complaint to provide "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" This rule " 'is satisfied if the statement gives the defendant fair notice of the claim and the ground upon which it rests.' " *Hall v. Kim*, 53 Haw. 215, 221, 491 P.2d 541, 545 (1971) (quoting *United States v. Missouri–Kansas–Texas R.R.*, 273 F.2d 474, 476 (10th Cir.1959)). The record does not clearly establish that the court determined Plaintiffs had complied with HRCP Rule 8(a)(1) with respect to a 1984 Keaau audit claim and/or that the Keaau order granting summary judgment on all claims "relating to Keaau" encompassed claims relating to a 1984 Keaau audit and report. Thus, we must remand these issues to the court for its express determination.

We note that it is difficult to conceive of how D & T would be absolved of any duty to Keaau for the 1984 Keaau audit. Under section 552(2), Keaau, as D & T's client, was obviously the "person" for whose benefit and guidance D & T supplied the 1984 Keaau report. Hence, D·& T could be subjected to liability for any negligent misrepresentations in the 1984 Keaau audit.[47]

## VII.

For the foregoing reasons, that part of that October 8, 1993 summary judgment order which concluded as a matter of law that D & T owed no duty to Keaau in connection with the 1983 Kohala report and the corresponding part of the August 31, 1994 partial final judgment which granted summary judgment in favor of D & T "on all claims relating to Keaau" are vacated. The case is remanded for trial on that claim. On remand, the court is instructed to apply section 552 in defining D & T's duty to Keaau in connection with this claim. The court is also instructed to determine whether a 1984 Keaau audit claim was sufficiently alleged and if so, whether it was encompassed in the Keaau order.

Plaintiffs' appeal of the causation order is dismissed.

## OPINION ON MOTION FOR RECONSIDERATION

On November 20, 1997, Defendant–Appellee Deloitte & Touche (D & T) filed a motion

---

**47.** It is clear from the terms of section 552 that a client of an accountant may bring an action against the accountant for negligent misrepresentation. In *In re Hawaii Corp.*, 567 F.Supp. 609, 617 (D.Hawai'i 1983), the court found that "[a]n accountant or auditor breaches his [or her] professional obligations if, in performing his [or her] services, he [or she] makes negligent misrepresentations" to his or her client and held that the standard of liability for such misrepresentations *is set forth in section 552*. The Hawai'i Supreme Court has held that section 552 is not limited to "situations involving damage stemming from a recipient of information's transactions with third parties other than the provider of information." *U.S. Steel*, 82 Hawai'i at 49–50, 919 P.2d at 311–12.

*Because we are not directly presented with the issue, we do not reach the question of whether plaintiffs who are clients of an accountant are* limited in their theories of recovery to the tort of negligent misrepresentation. In *Bily*, the California Supreme Court ruled that clients of an accountant may hold an accountant liable on a "pure negligence theory" for the conduct of the audit. *Bily*, 11 Cal.Rptr.2d at 73, 834 P.2d at 767. The comments to section 552 indicate that a client has the option of proceeding under section 552 or under the client's contract with the accountant:

> The person for whose guidance the information is supplied is often the person who has employed the supplier to furnish it, in which case, if it is supplied for a consideration paid by that person, he [or she] has at his [or her] election either a right of action under [section 552] or a right of action upon the contract under which the information is supplied.

Section 552 comment g.

for reconsideration following our decision in *Kohala Agriculture v. Deloitte & Touche,* No. 18368, slip op. (Haw.App. Nov. 10, 1997). On November 24, 1997, we extended the time to dispose of the motion until December 19, 1997, and ordered Plaintiffs–Appellants (Plaintiffs) to file an. answer to the motion. On December 3, 1997, Plaintiffs filed their opposition memorandum.

We issue this opinion to dispel any misconstruction of our reasoning as to why, in applying the *Restatement (Second) of Torts* § 552 (1977) (section 552), we concluded that genuine issues of material fact existed regarding whether D & T owed a duty to Keaau Agriculture (Keaau) in obtaining and communicating information contained in D & T's 1983 audit report for Kohala Agriculture (the 1983 Kohala report). Beyond this, we decline to reach any other ground urged by D & T in its motion.[1]

D & T contends that we mistakenly concluded that "knowledge of an 'apparent pattern' of creating limited partnerships which contracted with Hawaiian Holiday [Macadamia Nut Company, Inc. (Hawaiian Holiday)]" and "a supposed 'inconsistency' between the deposition testimony and affidavits" of John T. Marrack (Marrack), a D & T partner, and Carleton L. Williams (Williams), a D & T manager, created genuine issues of material fact.

However, it is not disputed that D & T knew about Hawaiian Holiday's operations, including the formation of the limited partnerships Hawaiian Macadamia Orchard (HMO) and Kohala Agriculture (Kohala), and Paul and Anita DeDomenicos' (the DeDomenicos) ownership interests in all of these entities. D & T knew that the DeDomenicos, the owners of Hawaiian Holiday, owned the general partner of HMO[2] and DeDomenico Orchard Corporation (Orchard), a partner in Kohala's general partner. Further, D & T knew that Hawaiian Holiday had entered into contracts with both HMO and Kohala for the production of macadamia nuts and the sale of macadamia nut trees and various services.

Viewing these facts in the light most favorable to Plaintiffs as the non-moving parties, it may be reasonably inferred that if Marrack and Williams knew at the time the 1983 Kohala report was issued that another limited partnership, Keaau, would be formed by the DeDomenicos and/or Hawaiian Holiday, then they could have known that (1) the DeDomenicos would have an ownership interest in a general partner of Keaau (Orchard); and (2) Orchard, as a recipient of the 1983 Kohala report, would transmit that report to the principals of Keaau (including

1. In its motion for reconsideration, Defendant–Appellee Deloitte & Touche (D & T) argues that "as a matter of law, any reliance by Keaau Agriculture [(Keaau)] on the 1983 Kohala audit report in conducting business with Hawaiian Holiday [Macadamia Nut Company, Inc.] was not justifiable." Because the *Restatement (Second) of Torts* § 552 (1977) (section 552) provides that the maker of a negligent misrepresentation is liable only for "pecuniary loss caused ... by ... justifiable reliance upon the information," D & T maintains that summary judgment was proper on this ground, even though the first circuit court (the court) did not depend upon it.

Section 552 "subjects the negligent supplier of misinformation to liability only to those persons for whose benefit and guidance it is supplied" and liability is further "limited to the transaction that [the supplier] intends, or knows that recipient intends, to influence, or to a substantially similar transaction." Section 552 comments h and j at 132, 137. Therefore we believe that the question of justifiable reliance is subsumed by these tests. Because we have held that genuine issues of material fact exist regarding whether D

& T is liable to Keaau under the standards of section 552, D & T's argument has, in effect, been addressed.

D & T also contends that summary judgment should be affirmed as to any claim based on the 1984 Keaau audit report. D & T states that the issue of whether Keaau asserted a claim based on the 1984 Keaau audit was "thoroughly briefed and argued before on [D & T's] motion for summary judgment." However, we remanded this issue because the record did not indicate whether the court ruled on this claim. In the absence of anything in the record demonstrating this, we cannot merely rely on Plaintiffs–Appellants' statement in their opening brief that the court "erroneously conclu[ded]" that the complaint failed to state a claim for negligence in connection with [D & T's] 1984 Keaau report.]" We considered and rejected D & T's other arguments on this point in our prior opinion, and we see no reason to modify our holding on this issue.

2. It is not clear from the record whether DeDomenico Orchard Corporation (Orchard) was the general partner of Hawaiian Macadamia Orchard (HMO).

Orchard itself, acting for Keaau) and that Keaau would rely on the report in similarly contracting with Hawaiian Holiday.[3]

Marrack and Williams represented in their depositions that they were unable to recall whether or not they knew that the DeDomenicos or Hawaiian Holiday would be forming additional limited partnership "syndications" or selling Keaau limited partnership interests. If Marrack and Williams did know that a new limited partnership such as Keaau would be formed, they could have known, taking into consideration their familiarity with Hawaiian Holiday, its limited partnership transactions, and the DeDomenicos' common ownership interests in the entities involved, that the 1983 Kohala report would be supplied to the new partnership's principals and subsequently used, as Plaintiffs alleged, as a basis for contracting with Hawaiian Holiday. Marrack's and Williams's inability to recall whether they knew that a new limited partnership such as Keaau would be formed calls into question the certainty with which they declared in their subsequent summary judgment affidavits that they "w[ere] not aware" Keaau would rely on the 1983 Kohala report and *"had no reason to be aware"* that Keaau would be provided the report. (Emphasis added.)

When the knowledge of the defendant is at issue, courts have been reluctant to grant summary judgment:

> Knowledge on the part of the company can be proved only by showing the state of mind of its employees. The court should

be cautious in granting a motion for summary judgment when resolution of the dispositive issue requires a determination of state of mind. Much depends on the credibility of the witnesses testifying as to their own states of mind. In these circumstances the jury should be given an opportunity to observe the demeanor, during direct and cross-examination, of the witnesses whose states of mind are at issue.

10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure: Civil* § 2730, at 237 (2d ed.1983) (footnote omitted) (quoting *Croley v. Matson Navigation Co.,* 434 F.2d 73, 77 (5th Cir.1970), *reh'g. denied,* 439 F.2d 788 (1971)). We acknowledge that "the fact that a party desires to have an affiant's statements tested by the jury, *in and of itself,* will not preclude a grant of [a summary judgment] motion unless the evidence presented casts sufficient doubt on the affiant's credibility to create a genuine issue of material fact." *Id.* at 237–38 (emphasis added) (footnote omitted). As we have explained, however, it is the factual context of the relationships among D & T's client Hawaiian Holidays and its affiliated limited partnerships in which we view Marrack's and Williams's deposition and affidavit testimonies, the totality of which leads us to confirm our conclusion that summary judgment with respect to Keaau's reliance on the 1983 Kohala report was improvidently granted.

---

**3.** D & T mistakenly argues that because Keaau was not formed until after the 1983 Kohala report was issued, any "intent to benefit" Keaau, required for liability to attach under section 552, was "an impossibility." Based on the following comment, we believe this is an incorrect interpretation of section 552:

> [I]t is not necessary that the maker [of the representation] should have any particular person in mind as the intended, or even the probable, recipient of the information. In other words, *it is not required that the person who is to become the plaintiff be identified or known to the defendant as an individual when the information is supplied.* It is enough that the maker of the representation intends it to reach and influence either a particular person or persons, known to him [or her], *or a group or class of persons,* distinct from the much larger class

who might be reasonably be expected· sooner or later to have access to the information and foreseeably to take some action in reliance upon it. *It is enough, likewise, that the maker of the representation knows that his [or her] recipient intends to transmit the information to a similar* person, persons, or *group.*

Section 552 comment h at 132–33 (emphases added). Therefore, D & T could be liable to Keaau even if D & T did not know of Keaau's particular identity (because Keaau did not yet exist) when D & T issued the 1983 Kohala report. It would be sufficient if D & T knew that the report would be supplied to the principals of a new limited partnership to be formed by the DeDomenicos and/or Hawaiian Holiday to be used as a basis for contracting with Hawaiian Holiday.